## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.: 12-CV-00320-REB-CBS**

JOHN SENI, Derivatively on Behalf of CIBER, INC.,

        Plaintiff,

      v.

DAVID C. PETERSCHMIDT,
CLAUDE J. PUMILIA,
PETER H. CHEESBROUGH,
BOBBY G. STEVENSON,
JEAN-FRANCOIS HEITZ,
PAUL JACOBS,
STEPHEN S. KURTZ,
KURT J. LAUK,
ARCHIBALD J. MCGILL, and
JAMES C. SPIRA,

        Defendants,
and

CIBER, INC.,

        Nominal Defendant.

---

## AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
## FOR BREACH OF FIDUCIARY DUTY,
## UNJUST ENRICHMENT AND CORPORATE WASTE

---

By and through his undersigned counsel, Plaintiff John Seni ("Plaintiff") hereby submits this Amended Verified Shareholder Derivative Complaint (the "Amended Complaint") on behalf of CIBER, Inc. ("CIBER" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, corporate waste and aiding and abetting thereof.

## NATURE AND SUMMARY OF THE ACTION

1.     This action arises out of the Individual Defendants' decision to issue materially false and misleading statements concerning CIBER's financial results and business prospects from December 15, 2010, to the present (the "Relevant Period"). Since the filing of the initial complaint, the Individual Defendants have continued to breach their duties to the Company.

2.     On March 22, 2013, this Court granted Defendants' Motion to Dismiss the initial complaint in this action, finding that the Plaintiff failed to "make sufficiently specific allegations addressing each defendant individually."  Order Granting Motion To Dismiss, Docket #64, at 5 (the "Order").  In preparation for this Amended Complaint, Plaintiff carefully reviewed the Order, and amended his complaint accordingly to address the deficiencies this Court noted in the initial complaint.  Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief derived from the investigation of counsel, which included, without limitation: a) review and analysis of public filings made by CIBER and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, postings on CIBER's website concerning

- 1 -

the Company's public statements; d) pleadings, papers and any documents filed with and publicly available from the related pending Securities Class Action (defined herein) and e) review of other publicly available information concerning CIBER and the Individual Defendants (defined herein).  As set forth below, Plaintiff has now specifically identified the relevant Individual Defendants for each wrongful act and each false or misleading statement.

3.      In particular, as described in more detail below, Defendants Peterschmidt, Cheesbrough, and Pumilia, individually and on behalf of the Company, made false and misleading statements in public filings, press releases, and conference calls that touted the Company's positive financial results, significant growth, and presented aggressive forward guidance.  The remaining Individual Defendants, including Defendants Jacobs, Heitz, Kurtz, Lauk, McGill, Spira, and Stevenson, even if they did not personally make the false statements, breached their fiduciary duties to the Company by not correcting known false statements made on behalf of CIBER as was necessary to prevent the existing disclosures from being misleading.

4.      During the Relevant Period, Defendants Peterschmidt, Cheesbrough, and Pumilia described a wholesale overhaul of CIBER's organizational and managerial structure, as well as the implementation of new strategic initiatives designed to improve the Company's financial performance.  Throughout the Relevant Period, Defendants Peterschmidt, Cheesbrough, and Pumilia consistently and doggedly stressed that this "transformation" would improve the Company's worldwide financial performance.  When questioned about the impact of the Company's wholesale transition on CIBER's financial results, and particularly how the Company could embark on such a large scale

transition without any negative effect on performance, Defendant Peterschmidt steadfastly rebuffed notions that the overhaul would adversely affect CIBER's financial performance going forward or its ability to achieve its business outlook.

5.      Similarly, throughout the Relevant Period Defendants Peterschmidt, Cheesbrough, and Pumilia consistently maintained that the Company had an effective system of internal and disclosure controls in place concerning its financial reporting, and that the Company's financial performance during the transition would be adequately and accurately reported as a result.  Defendants Peterschmidt, Cheesbrough, Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson signed the Company's 10-K filing that included these assurances.

6.      However, unbeknownst to the public, the Company faced significant charges arising from legacy contracts entered into in or before 2009, and substantial weakness in sales in its North American sector, which accounted for over a third of the Company's total revenues during the Relevant Period.  These two significant issues, which went entirely undisclosed during the Relevant Period, significantly affected the Company's financial performance, in direct contradiction to the Individual Defendants' aggressive projections.  Moreover, contrary to the statements made by Defendants Peterschmidt, Cheesbrough, and Pumilia (which were endorsed by the remaining Individual Defendants) the Company's "transformation" made it more difficult to deal with these problems, which further affected the Company's financial performance.

7.      Moreover, due to their positions as officers and directors of the Company, each of the Individual Defendants knew that the Company, again in part due to the Company-wide overhaul, "lack[ed] operational discipline, process and controls" and that

such "operational issues" would result in charges arising from certain fixed-price projects that possessed cost assumption for contingencies that rendered such contracts unprofitable and at a high-risk of loss.  Defendant David C. Peterschmidt, CIBER's Chief Executive Officer ("CEO") even acknowledged that despite his earlier aggressive statements, the "shortfall in North American sales and revenue production … [was] ***not completely unforeseen***," thus admitting knowledge of this material, adverse, and undisclosed fact.

8.      Additionally, recent detailed testimony revealed in a grand jury presentment in Pennsylvania confirms that a high level officer of the Company, who continued to be employed by CIBER until December 2012, engaged in a pattern of misconduct that has resulted in criminal charges including unlawful bid-rigging, theft by deception, and criminal conspiracy.  CIBER's Board of Directors ("Board"), including Defendants Peterschmidt, Jacobs, Heitz, Kurtz, Lauk, McGill, Spira, and Stevenson, either knew of the misconduct or were reckless in not knowing, given that the charges relate to a CIBER contract that ballooned from $3.5 million to $62.3 million in a short period of time under circumstances that were strikingly similar to earlier improper contracts.  In 2009, an audit in Louisiana found that a former New Orleans city official had improperly accepted bribes from CIBER, and a CIBER contract with that city originally valued at $6.3 million grew to more than $46.2 million.  Given the pattern of misbehavior, Defendants Peterschmidt, Jacobs, Heitz, Kurtz, Lauk, McGill, Spira, and Stevenson had a duty to ensure that the Company had adequate operational discipline, process and controls in place, and the continued misconduct demonstrates the breach of those duties.

9.      As described in more detail below, each of the Individual Defendants was well aware that the Company's statements were false and misleading due to the CIBER's poor financial performance in the North American sector which represented almost 36% of the Company's revenue.  Further, because the Individual Defendants knew that the Company lacked the "operational discipline, process and controls" to properly and accurately evaluate its legacy contracts and gauge the profitability of its North American operations, and knew that there was a pattern of legacy contracts dramatically increasing under suspicious circumstances leading to eventual bribery charges, they knew that they had no basis to make positive statements concerning the Company's financial health and business prospects.  Notwithstanding these facts, instead of informing shareholders of the true financial condition of the Company, Defendants Peterschmidt, Cheesbrough, and Pumilia, with the approval of Defendants Jacobs, Heitz, Kurtz, Lauk, McGill, Spira, and Stevenson, continued to deceive investors by reaffirming the Company's earnings guidance and assuring investors that the Company would achieve its business outlook.  As a result of the materially false and misleading statements Defendants Peterschmidt, Cheesbrough, and Pumilia made, which were disseminated with the approval of Defendants Jacobs, Heitz, Kurtz, Lauk, McGill, Spira, and Stevenson, CIBER's stock traded at artificially inflated prices during the Relevant Period, reaching a high of $6.86 per share on April 6, 2011.

10.     Between March and June 2011, lavish termination payments were awarded to officers that were departing the Company, with the acknowledgment and approval of the members of the Board, including Defendants Jacobs, Heitz, Kurtz, Lauk, McGill, Spira, and Stevenson.   Defendant Cheesbrough and Tony Hadzi, the

Company's former executive vice president and president of the North America division, should have been terminated for cause.  Instead, they were each handsomely rewarded by Defendants Peterschmidt, Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson.  These payments were a gross waste of the Company's assets.

11.    Defendants Kurtz, McGill and Spira also approved modifications to a stock option agreement between the Company and Defendant Peterschmidt, as well as an additional award of 400,000 stock units, allowing Defendant Peterschmidt to reap additional financial benefits before the truth of Defendants' misstatements was revealed and further wasting the Company's assets.

12.    The Individual Defendants' attempts to mislead the market came to a crashing halt when they were forced to admit publicly what had long been known privately.  On August 3, 2011, the Company issued a press release and held an earnings conference call reporting financial results that were "significantly below … expectations," and announcing that it would suspend its full-year 2011 guidance due to "sales weakness in North America, [and] changes in estimates on five [fixed-price] projects that were signed in 2009 or earlier, and required adjustments to the balance sheet."   The underperforming five fixed-price contracts resulted in $13.4 million in charges against the Company's quarterly revenue and earnings.  Further, the Company disclosed a disappointing 23% decline in revenue for its North American operations. When the Company revealed the truth about its business health, CIBER's stock price plummeted $1.22 or approximately 23.6% in a single day, closing at just $3.94 per share on August 3, 2011 on extraordinarily high-volume trading.  By August 29, 2011,

the stock price had fallen to only $2.91 per share, a decline of almost 58% from the high on April 6, 2011.

13. CIBER's Board has not, and will not commence litigation against defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to CIBER for authorizing or failing to correct the false and misleading statements alleged herein. Accordingly, a pre-suit demand upon the CIBER Board is a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate CIBER's rights against its wayward fiduciaries and hold them responsible for the damages they have caused CIBER. More specifically, Plaintiff brings this derivative action to (i) recover damages against CIBER's officers and directors for the benefit of the Company and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect CIBER and its shareholders from a repeat of the damaging events described below.

## JURISDICTION AND VENUE

14. This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

15. This Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in Colorado, or is an individual who has sufficient minimum contacts with Colorado so as to render the exercise of jurisdiction by the Colorado courts permissible under traditional notions of fair play and substantial justice. This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

16.    Venue is proper in this Court pursuant to 28 U.S.C § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violation of fiduciary duties owed to CIBER occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

17.    Plaintiff John Seni is a shareholder of CIBER common stock, and has continuously held throughout the Relevant Period.  Plaintiff is a resident of Illinois.

18.    Defendant CIBER is a Delaware corporation with principal executive offices located at 6363 South Fiddler's Green Circle, Suite 1400, Greenwood Village, Colorado.  CIBER is a global information technology ("IT") consulting, services, and outsourcing company applying practical innovation through services and solutions that deliver tangible results for both commercial and government clients.  The services offered by CIBER include application development and management, enterprise resource planning implementation, change management, project management, systems integration, infrastructure management and end-user computing, and strategic business and technology consulting.

19.    Defendant Peterschmidt is CIBER's President, CEO, and a director and has been since July 2010.  By the Company's admission, Defendant Peterschmidt is an "inside" director.    Defendant Peterschmidt received $2,985,084 in total

- 8 -

compensation in 2011, and $1,154,307 in 2012.  Defendant Peterschmidt is a resident of Colorado.

20.     Defendant Claude J. Pumilia ("Pumilia") is CIBER's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer and has been since April 2011.   Defendant Pumilia received $3,425,057 in total compensation in 2011, and $1,612,054 in 2012.  Defendant Pumilia is a resident of Colorado.

21.     Defendant Peter H. Cheesbrough ("Cheesbrough") was CIBER's Executive Vice President and CFO from October 2007 to April 2011; Treasurer from February 2008 to April 2011; a director from November 2002 to April 2011; and Interim CEO and President from April 2010 to July 2010.  Defendant Cheesbrough received $1,295,605 in total compensation in 2011.  Defendant Cheesbrough is a resident of Colorado.

22.     Defendant Paul A. Jacobs ("Jacobs") is the Chairman of the Board of CIBER, and is a member of the Audit Committee and the Chair of the Nominating/Governance Committee.  Jacobs began serving on the Board in 2005 and became Chairman on April 11, 2010.   According to CIBER, after assuming the chairmanship, Defendant Jacobs "guided the Board through the management transition."  Defendant Jacobs is a resident of Colorado.

23.     Defendant Bobby G. Stevenson ("Stevenson") is one of the founders of CIBER, and has served as a director of CIBER since its inception.   Defendant Stevenson served as CEO from 1977 to 1998.  Defendant Stevenson is a resident of Texas.

24. Defendant Archibald J. McGill ("McGill") has served as a director of CIBER since 1998. He currently is a member of the Audit and Compensation Committees. Defendant McGill is a resident of Arizona.

25. Defendant Stephen S. Kurtz ("Kurtz") is a director of CIBER, and is the Chairman of the Audit and Compensation Committees. Defendant Kurtz has served as a director since December 2007. Defendant Kurtz is a resident of Colorado.

26. Defendant James C. Spira ("Spira") is a director of CIBER, and is a member of the Compensation and Nominating/Governance Committees. Defendant Spira served as a director from 1994 to 1998 and again from 2002 to the present. Defendant Spira is a resident of Ohio.

27. Defendant Kurt J. Lauk ("Lauk") is a director of CIBER, and is a member of the Audit Committee. Defendant Lauk is a resident of California.

28. Defendant Jean-Francois Heitz ("Heitz") has served as a director of CIBER since June 14, 2011. Defendant Heitz is a resident of Washington.

29. Defendants Peterschmidt, Pumilia, Cheesbrough, Jacobs, Stevenson, McGill, Kurtz, Spira, Lauk, and Heitz are sometimes collectively referred to herein as the "Individual Defendants." Defendants Peterschmidt, Jacobs, Stevenson, McGill, Kurtz, Spira, Lauk, and Heitz are sometimes collectively referred to herein as the "Director Defendants."

## SUBSTANTIVE ALLEGATIONS

30. In late 2010, the Individual Defendants and other current and former CIBER executives decided to embark on a wholesale organizational and management "transformation" of the Company, with the goal of transitioning away from lower margin to higher margin business to drive higher revenue growth. This transformation also

sought to improve reporting and accountability at a managerial level.  In the weeks and months that followed this decision, Defendants Peterschmidt and Cheesbrough discussed this transformation at length in public through public filings with the SEC, press releases, investor conference calls, and other speaking engagements.  In these public statements, Defendants Peterschmidt and Cheesbrough repeatedly assured investors of three things:

1)    That this Company-wide overhaul would not have an adverse effect on the Company's financial condition, including its revenues, gross margins, or profitability, in the near or long term;

2)    That, on the contrary, this overhaul would yield immediate dividends for the Company and its shareholders; and

3)    That, as a result, the Company projected to maintain double digit growth throughout FY 2011 and beyond.

31.    As set forth in detail below, the Individual Defendants made false and misleading statements in public filings, press released or presentations, or acknowledged and approved such statements.  The dates the misleading statements were made, the documents in which they were made, and the specific defendants who made them are set forth in the following table:

| Date | Statements | Stated By or Signed By | Acknowledged By or Approved By |
|---|---|---|---|
| 12/15/10 | 8-K<br>Presentation and Press Release | Peterschmidt<br>Cheesbrough | Jacobs<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson |
| 02/11/11 | Press Release<br>Earnings Call<br>(Q4 2010 and full year 2010) | Peterschmidt<br>Cheesbrough | Jacobs<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson |
| 02/25/11 | 10-K<br>(Q4 2010 and full year 2010) | Peterschmidt<br>Cheesbrough<br>Jacobs<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson | |
| 03/08/11<br><br>(filing date 6/17/11) | 8-K<br><br>Amended and restated CIBER 2004 Incentive Plan | Peterschmidt | Peterschmidt<br>Jacobs<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson |
| 03/10/11 | 8-K<br>Press Release<br><br>Termination payments to Cheesbrough | Peterschmidt<br>Jacobs<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson | Peterschmidt<br>Jacobs<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson |
| 04/13/11 | 8-K<br><br>Termination payments to Hadzi | | Peterschmidt<br>Jacobs<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson |
| 05/03/11 | 10-Q<br>Press Release<br>Earnings Call<br>(Q1 2011) | Peterschmidt<br>Pumilia | Peterschmidt<br>Jacobs<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson |

| 06/16/11 | 8-K<br><br>Letter Agreement with Stevenson | | Peterschmidt<br>Jacobs<br>Heitz<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson |
|----------|-----------|---------|-----------|
| 06/23/11 | 8-K<br><br>Modification to stock option agreement with Peterschmidt | Kurtz<br>McGill<br>Spira | Peterschmidt<br>Jacobs<br>Heitz<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson |
| 06/23/11 | 8-K<br><br>Award of stock to Peterschmidt | Kurtz<br>McGill<br>Spira | Peterschmidt<br>Jacobs<br>Heitz<br>Kurtz<br>Lauk<br>McGill<br>Spira<br>Stevenson |

## A.   False and Misleading Statements

32.    On December 15, 2010, the Company hosted a meeting with investors and analysts in which Defendants Peterschmidt and Cheesbrough presented the Company's purported "Vision Update and Roadmap to Future Success." The same day, CIBER filed a Form 8-K with the SEC announcing the meeting, and attached slides that it would present at the meeting as well as its press release formally announcing the meeting.   In both the slides and the press release, the Company presented its long-term business outlook and 2011 guidance, as follows:

CIBER's long-term objectives include:

- Double-digit revenue growth annually
- Gross profit margin exceeding 30%
- Operating income margin exceeding 8%
- Double-digit earnings per share growth annually

For 2011, a year the company called a first step in achieving its long-term objectives, the company expects:

- Revenue growth to exceed 4.0%
- Gross profit margin to exceed 25.5%
- Operating income margin to exceed 3.5%
- Earnings per share to exceed $0.30

33.   In the press release, Defendants Peterschmidt and Cheesbrough trumpeted the Company's projected growth and prosperity.  Defendant Peterschmidt proclaimed that the Company had "developed a strategic plan and instilled stricter operational regimens," the "key elements" of which included "a tighter focus on [CIBER's] market approach, development of a world-class sales force, and enhancements to [the Company's] information technology infrastructure."  Defendant Peterschmidt further expressed unbridled optimism for the Company's prospects for fiscal year 2011, adding "[s]ince my arrival in July, we have made progress on these initiatives and the momentum we have created will continue through 2011, a year in which financial results will improve and set the stage for 2012 and beyond."

34.   That same day, in a conference call, Defendant Cheesbrough reiterated the Company's business outlook presented in the press release.  Further, Defendants Peterschmidt and Cheesbrough acknowledged that the Company was transitioning away from "lower margin business" and focusing on "higher value" or high-margin projects that would improve CIBER's profitability, and that the business projections took the transition into account.  Notably, Defendant Cheesbrough explained that CIBER previously had focused on too many lower margin contracts that had put "our profitability . . . below par and significantly below the performance of our competitors."  However, Defendant Cheesbrough stressed that the Company would no longer be

burdened by this low margin contracts, because the Company "***ha[s] already walked through a number of actions which include runoff of existing lower margin business. . . . We have already put a stop to the growth in this type of project.***"

35.     Defendant Cheesbrough further explained that, in addition to off-loading the existing low margin contracts, the Company's transition would prevent CIBER from entering into such poor contracts in the future:

> **Peter Cheesbrough** - *CIBER, Inc. - EVP, CFO*
>
> ***Our sales team is focused on selling higher value, more strategic solutions delivered through the verticals and practices, better contract execution***. This starts with better planning and rigorous project management discipline, as well as providing the management team with the right information. We have imposed new requirements for our project managers and we are also providing improving the quality of the information we are providing to them to provide them with better ability to manage projects.
>
> We have also institute a rigorous new contract terms and margins review process before any contract can be entered into, and I am going to come back to that in a bit more moment and give you more detail on that. We have increased the visibility of and implemented greater oversight on project performance. This includes regular project reviews with particular focus on those not meeting expectations.
>
> *   *   *
>
> We have rewritten our standard contract terms to tighten procedures around change controls for scope changes. Required payment terms have been established, a review of project pricing, expected margins, project projected cash flows, as well as their timing. All new contracts are required to have frequent milestones and the ability to bill customers regularly to eliminate the unbilled revenue issue. ***This will stop new low margin contracts***, unfavorable contract terms as well as infrequent milestones. We are also training our sales force to improve their negotiating skills which will help them gain customer understanding for the need for these changes.

36.     On the basis of these representations – that the Company's transformation would halt the execution of low margin contracts, and that in fact existing

low margin contracts had already been unloaded – Defendant Cheesbrough concluded with extremely aggressive financial guidance for FY 2011:

> Moving on to 2011, this is a transitional year where we are laying the groundwork to achieve the improved performance expected in the long-term model. ***For 2011 we see revenue growth of more than 4%, focusing on the right quality deals, more focused than in the past, gross profit of around 25.5% with improvement coming from higher quality deals, increased offshore delivery, better quality management of projects as well as other practices we have reviewed this mornings, operating margins exceeding 3.5% driven by the improvement in gross margin and efficiencies from streamlining North American operations.***

37.    On February 22, 2011, CIBER issued a press release announcing its financial results for both the fourth quarter and the 2010 fiscal year ended December 31, 2010.  In the press release, Defendant Peterschmidt raved that the Company was "undergoing an important transformation," and that CIBER had "set into motion a detailed and focused strategic plan and put in place the operational regimens necessary to achieve sustained and predictable performance and to increase shareholder value."  He expressed his optimism for the Company's prospects in 2011, adding: "We have entered 2011 with a tighter focus, increased discipline, a more efficient model and we continue to see general economic improvements in many markets."  Accordingly, management reaffirmed its long-term outlook and guidance for 2011, as follows:

> Long term outlook:
> - Double-digit revenue growth
> - Gross profit margin exceeding 30%
> - Operating margin exceeding 8%
> - Double-digit [Earnings Per Share ("EPS")] growth
> - Cash flow from operations to approximate net income

2011 expectations:
- Revenue growth exceeding 4%
- Gross profit margin exceeding 25.5%
- Operating margin exceeding 3.5%
- EPS exceeding $0.30
- Tax rate in the mid thirties
- Cash flow from operations of approximately $30 million
- Capital expenditures of approximately $20 million, mostly to fund IT infrastructure improvements and the India build-out

2011 Key Success Factors
- Higher quality deal wins in key verticals
- Improved [Days' sales outstanding ("DSO")] and cash collection
- Gross and operating margin improvement
- Expanded India delivery
- Enhanced operational execution

38.     That same day, in an earnings conference call, Defendants Peterschmidt and Cheesbrough reiterated the Company's financial results and business outlook presented in the press release.  As to issues concerning "fixed price project overruns [and] problematic legacy engagements" associated with the low-margin projects that the Company was transitioning from, Defendant Peterschmidt stated that "[the Company] saw most of the problematic scenarios flow to the surface in the fourth quarter," thus suggesting to the market that the worst effects of these low-margin contracts *had already been realized*.   In fact, when questioned about the Company's financial condition and business outlook in light of the operational transitions and underwhelming margins for the quarter, Peterschmidt steadfastly maintained that he "remain[ed] very confident about the outlook for the company":

**Analyst**

First thing, margins, obviously a little disappointing in the quarter, beyond the project charges, a lot of moving parts but -- particular *I wanted to focus on just, if you could talk a little bit more about the fixed price project overruns, the problematic legacy engagements, sort of the stuff that I guess is going to be ongoing into 2011*.

- 17 -

How large are we talking here? *What kind of ongoing impact is expected*? When will these things wind down? Just to help investors, I guess, kind of get some confidence that these issues are kind of boxed in and not things that may pop up here and there as unpleasant surprises.

**Dave Peterschmidt** - *CIBER, Inc. - President, CEO*

Yes, George, this is Dave. *I'm pretty confident that we saw most of the problematic scenarios flow to the surface in the fourth quarter.* Obviously, we didn't like the outcome, but I think we took the necessary actions to contain the downside risk in the future. Will we find one or two other things that we don't know about? Possibly. *But, I do believe that we're probably 90% there in containing the types of problems that really battered the margins in the fourth quarter.*

\*   \*   \*

**Analyst**

Okay. Last question, just a high-level question, stepping back, it's been a little over two months since you held the meeting in New York. You had kind of -- obviously a mixed quarter, but a little disappointing on the margin side, which is obvious a key focus for investors, *but you're maintaining your outlook. Has anything over the past couple of months changed in any major way in terms of your confidence and your ability to achieve the guidance and the targets that you've reiterated, excuse me, reiterated more or less confident*? If so, why or why not?

**Dave Peterschmidt** - *CIBER, Inc. - President, CEO*

No, I'm actually -- *I actually remain very confident about the outlook for the company. As I indicated, we're seeing good business coming in, we've got a top line that's growing. We've got the new bookings that are coming in, are meeting our standards for margin and risk mitigation*. So, I'm very confident about that.

The team has really been embracing the new operational regimens, and I believe that's bringing tremendous cohesion to this management team. So, I don't see a market problem, and I don't see an internal execution problem. *I think we're on solid ground, based on what we told you in December.*

And, we tried to signal, as best we can, that we knew the fourth quarter was going to be a really rugged quarter for us, and that we were going to do a lot of cleanup and that we were going to probably suffer a couple of execution issues just because of the massive realignment that we did with the consolidation of Custom Solutions and ERP and then going to a functional org structure. *So, yes, the fourth quarter hasn't put me off at*

*all. I mean, quite frankly, I don't like the outcome, but I think we did all the right things*.

39.     On February 25, 2011, the Individual Defendants caused the Company to file its Form 10-K for the fourth quarter and 2010 fiscal year ended December 31, 2010, with the SEC.   The Form 10-K reiterated the financial results issued in its earnings release, and was signed by Defendants Peterschmidt, Cheesbrough, Jacobs, Kurtz, Lauk, McGill, Spira and Stevenson.   Further, the Individual Defendants warranted that they had conducted an evaluation of the effectiveness of "the design and operation of [CIBER's] disclosure controls and procedures" and the Company's "internal control over financial reporting," and determined that they were "effective."   These representations were critical in the context of the Company's transition for two reasons. First, with managerial and operational overhaul of the entire Company, CIBER investors clearly wanted assurances that the Company was maintaining effective oversight and disclosure control and procedures.   Second, given the contrast between the aggressive forecasts by Defendants Peterschmidt and Cheesbrough as CIBER moved away from low margin contracts and the markedly more tepid fourth quarter earnings results in part because of low margin legacy contracts, investors wanted assurances that the true impact of these legacy contracts was being reported accurately to the market.   Investors received assurances on both fronts.

40.     In particular, the 10-K stated:

**Item 9A.   Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures -** During the fiscal period covered by this report, our management, with the participation of *our principal executive officer and principal financial officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures*, as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act.   ***Based upon this evaluation,***

*our principal executive officer and principal financial officer have concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective* to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (2) accumulated and communicated to our management, including our principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control Over Financial Reporting** - *Our management is responsible for establishing and maintaining adequate internal control over financial reporting*, as such term is defined in Exchange Act Rule 13a-15(f). *CIBER's internal control systems were designed to provide reasonable assurance to the Company's management and Board of Directors regarding the preparation and fair presentation of published financial statements*. All internal control systems, no matter how well designed, have inherent limitations. Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including *our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting* as of December 31, 2010, based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Based on our evaluation under the framework in Internal Control - Integrated Framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2010*.

41.    On May 3, 2011, CIBER issued a press release announcing its financial

results for the fiscal 2011 first quarter. The Company reported revenues of $282.5

million (increase of 8% year-over-year), earnings of $4.1 million (increase of 17% year-

over-year), gross margin of 25.8%, and EPS of $0.06 for the quarter. Defendant

Peterschmidt raved about the Company's "largest year-over-year [revenue] increase in

10 quarters," boasting that "[t]he transformation of CIBER continues to progress," and the Company's "financial performance this quarter, particularly [its] improved gross margin, underscores the progress [that CIBER is] making."  Defendant Peterschmidt assured investors that although the North American division was exhibiting "lagging sales performance," that the Company was "confident that [it was] taking the necessary steps to improve the trend in the back half of this year and to deliver on [its] full-year expectations."  As such, the Company reaffirmed its long-term and 2011 business outlook.  The press release read as follows, in pertinent parts:

### CIBER REPORTS REVENUE GROWTH OF 8% AND EPS OF $0.06
### International Division Robust Results Continue
### 2011 Outlook Reaffirmed

**GREENWOOD VILLAGE**, **Colo.**, **May 3, 2011**— CIBER, Inc. (NYSE: CBR), a global information technology consulting, services and outsourcing company, today reported results for the first quarter of 2011.

* * *

President and Chief Executive Officer Dave Peterschmidt said, "***The transformation of CIBER continues to progress***. Our goal is to improve financial performance utilizing a refined strategic approach, improved operational regimens, and increased as well as narrowed focus on higher margin, well developed offerings.  ***Our financial performance this quarter, particularly our improved gross margin, underscores the progress we are making***."

Peterschmidt continued, "The ongoing transformation will have its ups and downs during this transitional year.  Our International division, which delivered another great quarter, has made substantial progress.  The North America division however, has not progressed as quickly.  ***We made specific changes to the North American leadership to address the operational issues and to ensure that we have a plan in place to deliver financial performance at this division in line with our expectations***."

* * *

- 21 -

**Outlook**

Management reaffirmed its long-term outlook and its expectations for 2011.

Long-term outlook:
- Double-digit revenue growth
- Gross profit margin exceeding 30%
- Operating margin exceeding 8%
- Double-digit EPS growth
- Cash flow from operations to approximate net income

***2011 expectations***:
- ***Revenue growth exceeding 4%***
- ***Gross profit margin exceeding 25.5%***
- ***Operating margin exceeding 3.5%***
- ***EPS exceeding $0.30***
- ***Tax rate in the high-twenty to low-thirty range (original expectation was mid thirties)***
- ***Cash flow from operations of approximately $30 million***
- ***Capital expenditures of approximately $20 million, mostly to fund IT infrastructure improvements and the India build-out***

2011 Key Success Factors
- Higher quality deal wins in key verticals
- Improved DSO and cash collection
- Gross and operating margin improvement
- Expanded India delivery
- Enhanced operational execution

"While lagging sales performance within our North America division has impacted financial results into the second quarter, we are confident that ***we are taking the necessary steps to improve the trend in the back half of this year and to deliver on our full-year expectations***," Peterschmidt concluded.

42.    That same day, in an earnings conference call, Defendants Peterschmidt and Pumilia reiterated the Company's financial results and business outlook presented in the press release.    Although admitting that 2011 was a transitional year for the Company, Defendants Peterschmidt and Pumilia vehemently insisted and expressed

supreme confidence that the Company expected to achieve its aggressive 2011 business outlook:

> **Claude Pumilia**- *CIBER, Inc. - CFO*
>
> \* \* \*
>
> Moving to our outlook. *As you read this morning in press release, we are affirming our long-term and 2011 outlook.* For the long term, at least three years out, our mature model should deliver the following -- double-digit revenue growth, gross profit margin exceeding 30%, operating margin exceeding 8%, double-digit EPS growth, and cash flow operations that approximates net income.
>
> Specific for 2011, we expected some lumpiness this year as we transition the Company. *We remain confident, however, in our ability to achieve our stated goals, despite the challenges in North America persisting into the second quarter*.
>
> *For the year, we still expect to deliver the following -- revenue growth exceeding 4%; gross profit margin exceeding 25.5%; operating margin exceeding 3.5%; and EPS exceeding $0.30; a tax rate in the high 20 to low 30 range -- this is down from our previous expectation of the mid-30s tax rate and the changes from a reduction in US taxable income this year; cash flow from operations in the $30 million range; and finally, capital expenditures in the $20 million range.* The increase in 2011 is mostly from CapEx for IT infrastructure improvements and the continued India build-out.
>
> With that, I will turn it back to Dave.
>
> **Dave Peterschmidt** - *CIBER, Inc. - President, CEO*
>
> Okay. Thanks, Claude.
>
> I'm generally pleased with the quarter, obviously, especially in our ability to grow both gross margin and top-line revenue simultaneously, as evidenced by our international group. This has come about through a persistent and continued focus on their part on vertical markets and key practices.
>
> We are clearly bringing this same focus to our North American business. Although the performance of this unit was disappointing, it is a byproduct of the much needed changes we made in Q3 and Q4 of last year. *I am confident we will get the sales and the delivery resources in place*

- 23 -

*over the next two quarters to bring this unit up to the performance expectations we have for it*.

\* \* \*

**Analyst**

Okay. Just as it relates to the 2011 guidance that was reiterated, just given the North American challenges and what you've seen as you continue to go around and look at the different parts of the business, would you note any change, I guess, in your confidence levels on achieving the guidance that you've set out?

**Dave Peterschmidt** - *CIBER, Inc. - President, CEO*

*No. No, not at all*. In fact, we are very encouraged by international's performance in Q1. And we have some pretty good visibility into that business going forward and we're encouraged by what we see there. And we think, as in any turnaround like this or reorg, we're going to have a couple of soft spots, but the balance that we've got in the business and the strength that we see in international we think is a real positive for us and it's going to help us.

43.     The same day, the Company to filed its Form 10-Q for the first quarter of the 2011 fiscal year ended March 31, 2011, with the SEC, signed by Defendants Peterschmidt and Pumilia and approved by Defendants Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson.   The Form 10-Q reiterated the financial results issued in its earnings release.  Further, the Individual Defendants claimed that they had conducted an evaluation of the effectiveness of  "the design and operation of [CIBER's] disclosure controls and procedures," and determined that they were "effective":

**Item 4.  Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures —** During the fiscal period covered by this report, our management, with the participation of *our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures*, as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act.  *Based upon this evaluation, our principal executive officer and principal financial officer have concluded that, as of the end of the period covered by this report,*

- 24 -

***our disclosure controls and procedures were effective*** to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (2) accumulated and communicated to our management, including our principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

44.     The above statements made by Defendants Peterschmidt, Cheesbrough and Pumilia and approved by Defendants Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson were materially false and misleading because each of these Defendants: (i) knew that the Company lacked the operational discipline, process, and controls to properly evaluate the financial impact of its legacy contracts and the performance of its North American operations and, as such, had no basis to make positive statements about CIBER's financial health and future growth; (ii) knew the Company could not achieve its reported business outlook and aggressive guidance due to the fact that they were migrating away from their low margin business, and unprofitable legacy fixed-price contracts would have to be charged against the Company's revenue and earnings; and (iii) knew that the declining sales in its North American division would continue throughout the 2011 transitional period and adversely affect the Company's 2011 financial results.

45.     Further, as detailed in the allegations in ¶¶[57-70] below, all of the Individual Defendants knew or were reckless in not knowing that high level officers of the Company were engaging in criminal misconduct which would further jeopardize the Company's revenue and earnings, and that the Company lacked the operational discipline, process, and controls to detect or prevent such misconduct.

**B.   Unjustified Termination/Separation Payments**

46.   On March 10, 2011, the Company announced that Defendant Cheesbrough would be ending his employment with the Company at the end of April 2011.  While Defendant Cheesbrough should have been terminated for cause, instead he was handsomely rewarded by his fellow defendants.  Defendants Peterschmidt, Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson approved termination payments to Cheesbrough including a lump sum payment of $684,000, composed of an amount equal to his base salary ($360,000) plus his annual target cash incentive bonus ($324,000, which is 90% of base salary).  Defendants Peterschmidt, Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson also approved an accelerated vesting of 29,280 stock options and 89,760 restricted stock units for Defendant Cheesbrough.  In total, Defendant Cheesbrough was awarded $1,295,605 in compensation in 2011.

47.   On April 13, 2011, the Company announced that Tony Hadzi, Executive Vice President and President-North America Division, would be ending his employment with the Company on May 1, 2011.  While Hadzi should have been terminated for cause, instead he was handsomely rewarded by Defendants Peterschmidt, Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson, who approved termination payments to Hadzi in a lump sum of $712,500, composed of an amount equal to his annual base salary plus the target cash bonus opportunity in effect at the time of the termination. Hadzi also received a pro-rata cash incentive bonus with respect to 2011.  In total, including stock awards and options, Hadzi was awarded $1,718,626 in compensation in 2011.

48.     On May 18, 2011, the Company filed a form 8-K with the SEC reporting the amended and restated CIBER 2004 Incentive Plan (the "Incentive Plan").  The members of the Board, including Defendants Peterschmidt, Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson, had approved the amendments, including the issuance of 4,750,000 additional shares, bringing the total number of authorized shares to 14,750,000.  The Incentive Plan provides for awards of up to 1 million shares to each individual per year, with awards to be determined by the Board and the Compensation Committee.

49.     The Incentive Plan's stated purposes are to:

provide the officers, employees, consultants, and directors of the Company selected for participation in the [Plan] with added incentives to continue in the long-term service of the Company and to create in such persons a more direct interest in the future success of the operations of the Company by relating incentive compensation to increases in stockholder value, so that the income of such persons is more closely aligned with the income of the Company's stockholders. The [Plan] is also designed to enhance the ability of the Company to attract, retain and motivate officers, employees, consultants, and directors by providing an opportunity for investment in the Company.

50.     However, the Incentive Plan provides no meaningful limitations on the amount of stock awards to be granted, and allows the Individual Defendants to grant the awards to themselves with no meaningful guidelines.  The stated purposes of the Incentive Plan, approved by Defendants Peterschmidt, Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson, are false and misleading because the actual purpose is to allow the Individual Defendants to distribute the Company's assets to themselves, to the detriment of the Company.

51.     On June 16, 2011, the Company filed a form 8-K with the SEC reporting a letter agreement with Defendant Stevenson, executed the same day, which confirmed

the ongoing benefits that Defendant Stevenson receives from the Company.  Following his resignation as Chairman of the Board in 2010, and with the continuing approval of Defendants Peterschmidt, Jacobs, Heitz, Kurtz, Lauk, McGill, and Spira, Defendant Stevenson has received and will continue to receive benefits including (a) office space through July 31, 2016; (b) administrative support through December 31, 2013; (c) health care insurance for Defendant Stevenson and his spouse while he is a member of the Board and for three years after Defendant Stevenson ceases to be member of the Board; (d) long-term care insurance for Defendant Stevenson's spouse; and (e) membership dues and fees at Castle Pines Golf Club and Glenmoor Country Club through 2013.

52.    On June 23, 2011, the Compensation Committee of the Board, composed of Defendants Kurtz, McGill and Spira, approved a modification to a stock option agreement, dated July 1, 2010, between CIBER and Defendant Peterschmidt, and the Company filed a form 8-K with the SEC regarding the modification.  The original agreement provided that the stock options would vest in four equal yearly installments each on July 1, and the modification, which was acknowledged or approved by Defendants Peterschmidt, Jacobs, Heitz, Kurtz, Lauk, McGill, Spira, and Stevenson, provided that the remaining unvested options after July 1, 2011 will vest in 36 equal monthly installments beginning on August 1, 2011.   This modification allowed Defendant Peterschmidt to reap additional financial benefits from his stock options, before the truth of the Defendants' misstatements was revealed.

53.    Also on June 23, 2011, the Compensation Committee of the Board, composed of Defendants Kurtz, McGill and Spira, approved an award of an additional

400,000 restricted stock units to Defendant Peterschmidt, which was also acknowledged or approved by Defendants Peterschmidt, Jacobs, Heitz, Kurtz, Lauk, McGill, Spira, and Stevenson.

### THE TRUTH IS REVEALED

54.    On August 3, 2011, CIBER issued a press release announcing its financial results for the fiscal 2011 second quarter.  The results were disappointing, to say the least, as the Company reported revenues and earnings that were well-below expectations.  In particular, the Company reported revenue of $267.8 million, a mere 1% increase in revenue year-over-year, and a net loss of $58.4 million, far below the aggressive forecasts made by the Individual Defendants during the Relevant Period.  These dismal figures were attributed, in part, to a $13.4 million charge as a result of "adjustment for significant changes in estimates related to costs or scope on the five fixed-price projects."  These five "fixed-price projects" were precisely the types of low margin legacy contracts whose adverse financial effect:

- As Defendant Cheesbrough claimed on December 15, 2010, the Company had already mitigated (the Company "*ha[s] already walked through a number of actions which include runoff of existing lower margin business*"); and

- As Defendant Peterschmidt claimed on February 22, 2011, the Company had already absorbed (in response to an analyst question about fixed price overrun, "*we're probably 90% there in containing the types of problems that really battered the margins in the fourth quarter*.").

55.    In addition, despite the fact that the Individual Defendants minimized the seriousness of the North American division's underperformance during the Relevant Period, the underwhelming North American division contributed greatly to the Company's sub-par quarterly performance reporting a 23% decline in revenue. Defendant Peterschmidt blamed the Company's poor showing on "issues in [CIBER's] North American business … [and] five fixed-price contracts signed in 2009 or earlier in the United States that no longer carry the same level of profitability and thus diminished earnings in the quarter."  As such, the Company suspended its guidance for 2011.  The press release read as follows, in pertinent parts:

> **GREENWOOD VILLAGE**, **Colo.**, **Aug. 3, 2011**— CIBER, Inc. (NYSE: CBR), a global information technology consulting, services and outsourcing company, today reported results for the second quarter of 2011.
>
> **Highlights for the second quarter 2011 (results include several significant items described below):**
>
> - Revenue increased 1% to $267.8 million
>
> - Operating loss of $26.5 million, or operating income of $5.2 million excluding significant items
>
> - Net loss of $58.4 million, or net loss of $0.1 million excluding significant items
>
> - EPS of $(0.81), or EPS of $0.00 per share excluding significant items
>
> - Cash on hand at quarter end of $62 million
>
> President and Chief Executive Officer Dave Peterschmidt said, "Our International business continued to perform extremely well with double-digit revenue growth and margin expansion in the second quarter. This success is a function of our focused strategy and I remain confident that we can replicate this in North America as we continue to narrow our focus and increase our discipline."
>
> Peterschmidt continued, "*Our overall performance, however, was adversely affected by issues in our North American business and on*

- 30 -

*the balance sheet*. Specifically, as a result of a more disciplined approach to managing CIBER, *we identified five fixed-price contracts signed in 2009 or earlier in the United States that no longer carry the same level of profitability and thus diminished earnings in the quarter*. The charges related to these contracts and other items reflect the fact that we are implementing the rigorous processes we need to make CIBER a truly world-class, professionally managed services company."

*The Company noted that as a result of the reduction in earnings related to the five fixed-price contracts, a revenue decline in North America and the write-off of historic balance sheet items; it is withdrawing its financial guidance for full-year 2011*.

Claude Pumilia, Executive Vice President and Chief Financial Officer, commented, "*We have suspended guidance for 2011 because our North America business does not yet have the operational rigor required to drive predictable results*. We do believe, however, that we have the downside risk from the five projects understood and contained. We are making progress during this transitional year, namely winning higher-value engagements, increasing the quality of our delivery, and reducing our risk profile by adhering to more stringent processes. I am confident that we will drive improved financial performance across the business."

\* \* \*

*The North American division saw revenue decline 23%, or 13% when adjusted for the five fixed-price projects*. Revenue continues to be impacted by the open sales positions that existed coming into this year as well as the time it takes for new sales hires to become fully effective. *Gross profit and gross margin were down compared to last year's second quarter as a result of the significant changes in estimates or scope of the five projects as well as investments made to develop higher-value offerings*.

\* \* \*

<u>Significant Charges</u>

In the second quarter 2011, the Company incurred five significant charges which totaled $58.1 million after-tax ($31.7 million pre-tax) or $0.81 per share.

The items were:

- *$13.4 million (after-tax and pre-tax) reduction of revenue, gross profit, operating income and net income and a $0.19 per share reduction of earnings per share for an adjustment*

*required under the percentage-of-completion accounting rules as a result in changes in estimates or scope on five fixed-price projects.*

56.     That same day, in an earnings conference call, Defendants Peterschmidt and Pumilia struggled to explain the Company's suddenly meek business prospects that were touted since the Company's fourth quarter fiscal 2010 earnings disclosures. Peterschmidt acknowledged that the "reported results … were significantly below [the Company's] expectations."  Unable to reconcile its positive prior-period statements and business outlook with the Company's dismal figures, Peterschmidt attempted to portray the "variables" underlying the sub-standard financial results, namely - the "sales weakness in North America, [and the] changes in estimates on five projects that were signed in 2009 or earlier," as a "perfect storm that has taken [CIBER] off course in meeting full-year 2011 guidance."   However, as detailed above, the Individual Defendants knew that this "perfect storm" was approaching, or at the very least knew that they had no basis to make public statements touting the Company's financial condition and business prospects:

**David Peterschmidt** – *CIBER, Inc - CEO*

Thank you, Gary. Good morning, everyone. **As you have seen, CIBER today reported results that were significantly below our expectations.** Although the results were not acceptable to us, we can clearly see that the fundamentals are changing, which in turn will lead to improve financial performance. In summarizing the quarter, we drove a strong revenue and profit performance by our largest division, International. **Offsetting this was sales weakness in North America, changes in estimates on five projects that were signed in 2009 or earlier, and required adjustments to the balance sheet. It is unfortunate that these variables and the resulting charges against earnings came together in one quarter, and created a perfect storm that has taken us off course in meeting full-year 2011 guidance.**

57.     Importantly, Defendant Peterschmidt not only explained that the significant underperformance of the Company was related to a decline in North American sales and charges against legacy contracts, but he also admitted that at least he (and likely other Individual Defendants) actually knew about these problems – and knew that the Company's organizational "transformation" was exacerbating them – in advance but failed to disclose them:

> The other significant impact on Q2 was the shortfall in North American sales and revenue production. ***Although it is disappointing, it is not completely unforeseen, given the tremendous reorganization this unit has undergone, as it moves from a branch model to a functional model.*** Additionally, it has rebuilt its sales force from a semi-commodity model sales force to a true enterprise sales force. We are clearly in the middle of a full turnaround of this Company. This involves our cultural shift towards becoming a professionally-managed and operated Company. We have built momentum by making significant improvements to the processes and the depth of our people. As a result, we see the fundamentals in our business gaining strength daily, and know these will result in improved financial performance.

58.     After the above revelations seeped into the market, the Company's stock price plummeted to $3.94 per share on August 3, 2011, a decline of 23.64% from a previous day closing price of $5.16 per share, on high volume trading.  The decline continued and by August 29, 2011, the stock price had fallen to only $2.91 per share, a decline of almost 58% from the high on April 6, 2011.

59.     On April 5, 2013, the Company filed its Proxy Statement for the 2013 annual meeting to be held on May 8, 2013.  The 2013 Proxy Statement requests approval of an additional amendment to the Incentive Plan, which would increase the number of shares authorized for issuance by 5,600,000 shares, increasing the aggregate number of shares authorized for issuance from 14,750,000 shares to 20,350,000 shares. As of March 26, 2013, there were 3,439,833 shares available for

issuance under the Incentive Plan, and the amendment would increase the number of shares currently available for issuance to 9,039,833 shares.

60.     The Incentive Plan continues to allow stock awards to be determined by the Board and the Compensation Committee, with no meaningful limitations on the amount of stock awards to be granted, and allows the Individual Defendants to grant the awards to themselves with no meaningful guidelines.

**FURTHER RECENT REVELATIONS SUBSTANTIATE PLAINTIFF'S CLAIMS**

61.     On March 13, 2013, the Pennsylvania Attorney General announced indictments against eight people in a pay-to-play scandal involving the Pennsylvania Turnpike Commission (the "Turnpike").  Among those charged is Dennis Miller, who at the time of the indictment was CIBER's Vice President of Business Development and State and Local Government, and Director of Sales for the Northeast Region.  Miller is charged with one count of unlawful bid-rigging, one count of theft by deception, one count of restricted activities, and one count of criminal conspiracy.

62.     According to the grand jury presentment, which followed an investigation that began in May of 2009, CIBER was awarded a $3.5 million technology contract with the Turnpike in 2005 (the "2005 Contract") under suspicious circumstances. At the time, CIBER was already working with the Turnpike under an earlier contract, and had prepared a Strategic Enterprise Technology Plan, which gave the Company access to the specific requirements of the 2005 Contract and an unfair competitive advantage. CIBER was awarded the 2005 Contract despite a cost estimate that was three times higher than the second highest bidder.

63.     The Turnpike later approved two contract increases without competitive bidding, one in February 2006 for $437,656 and one in May 2006 for $58,333,902,

bringing the total contact price to $62.3 million.   The grand jury found this to be "dramatic and unprecedented."

64.   In June 2008, the Turnpike awarded CIBER an additional contract for $19.28 million, bringing the total amount paid to CIBER to $82 million.

65.   Further, grand jury testimony by consultants involved with the contracts described a pattern of improper work practices including fabricated billing.  As detailed in the grand jury presentment:

> Miller directed that the Ciber consultants working on the Turnpike project bill 40 hours a week. This directive was given irrespective of what work the project actually necessitated. During a tour of the Turnpike facilities, one Ciber employee instructed its sub-contractors that they must bill out at least 40 hours per week at a minimum…. To compound matters, Ciber consultants were given repetitive and useless assignments in an effort to "make work" and bill out the full contract amount…. The bringing on of additional sub consultants and high turnover of Ciber consultants was part of the make work process. Each time a new consultant was brought on they had to learn the project from scratch, the progress made to date, and their specific assignment. Often consultants left before they could get up to speed, necessitating a new consultant and new training. All of that effort was billed at Turnpike expense, and witnesses appearing before the Grand Jury dubbed it "rework."

66.   The grand jury presentment also found that Miller bragged about his relationships with Turnpike officials, and provided travel expenses, gifts, dinners, and amenities to Turnpike staff.  Miller was also a donor to former State Senator Vincent J. Fumo, who is currently serving time in federal prison after his conviction on 137 counts of corruption.

67.   Miller received, in addition to his salary from CIBER, a commission based on 1.75% to 3% of CIBER's profit from the project, and bonuses.  Between 2003 and 2006, these amounts totaled more than $591,000.  Miller also secured a position for his daughter with the Turnpike, and she was billed out at a rate of $100 to $105 an hour for

a total of $496,082.50, despite the fact a witness testified that Miller's daughter "basically had no experience whatsoever."

68.     Miller continued his employment with CIBER until December 2012.

69.     On April 4, 2013, in response to the grand jury presentment, Pennsylvania Governor Tom Corbett announced that his office would be conducting an "integrity review" of all sixteen companies named in the report, and took immediate action against only one company, CIBER. Governor Corbett ordered the Pennsylvania Department of Transportation to not finalize a new $8.6 million contract that had recently been awarded to CIBER.

70.     The evidence in the grand jury presentment demonstrates that despite the assurances by the officers and directors of CIBER that the Company had "stringent processes" in place, the truth is that the Company has repeated a pattern of misconduct and breach of fiduciary duty.

71.     News articles noted that "this was not the first time that Ciber has been associated with scandal, or gifts." As described by The Patriot-News, a forensic audit in 2009 found that a former New Orleans city official had improperly accepted bribes from CIBER, and a CIBER contract with that city originally valued at $6.3 million grew to more than $46.2 million.

72.     The same article quotes CIBER's spokeswoman Robin Caputo as stating that CIBER has a clearly spelled out policy that "expressly forbids employees from soliciting, accepting or giving anything of value for the purpose of obtaining or rewarding favorable treatment" in connection with CIBER contracts, and "strictly forbids the offering or giving of anything of value to government employees who work in

government agencies that may be involved in decisions to purchase services or products from Ciber." Caputo further states that intended political contributions are "supposed to be forwarded to and handled by Ciber's General Counsel."

73.     The fact that CIBER officers such as Miller repeatedly contributed to political campaigns, and provided travel expenses, gifts, dinners and other amenities to Turnpike employees, while at the same time CIBER's contracts with related agencies were ballooning in value, demonstrates that the officers and directors of CIBER, including Defendants Jacobs, Heitz, Kurtz, Lauk, McGill and Spira, knew or were reckless in not knowing that CIBER's officers were violating any such policy.

74.     Further, CIBER's officers and directors, including Defendants Jacobs, Heitz, Kurtz, Lauk, McGill and Spira, knew or were reckless in not knowing about Miller's conduct because in 2009, a lawsuit was filed by Ralph Bailets, a former Turnpike employee, who alleged that he was fired from the Turnpike after questioning the improper $82 million contract to CIBER.  According to the lawsuit, Bailets was fired after repeatedly raising objections to CIBER's performance and costs.  Despite this information, Miller continued as a CIBER employee until December 2012.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

75.     By reason of their positions as officers, directors, and/or fiduciaries of CIBER and because of their ability to control the business and corporate affairs of CIBER, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CIBER in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in

furtherance of the best interests of CIBER and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

76.     Each director and officer of the Company owes to CIBER and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### Audit Committee Duties

77.     In addition to these duties, the members of the Audit Committee owed specific duties to CIBER under the Audit Committee's Charter to review and approve quarterly and annual financial statements, earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.  In particular, the Audit Committee's Charter provided as follows:

The Committee's duties, responsibilities and authority include:

- Engaging, approving the compensation of, removing (if circumstances warrant) and overseeing the work of the independent auditor including the negotiation and execution of the engagement letter. Reviewing the audit plan including scope, staffing, locations, reliance upon management and general audit approach. The outside auditor shall report directly to the audit committee.

- Annually reviewing the independence and performance of the auditors and the qualifications of the key audit partner and audit managers including a review of the accounting firm's quality control procedures, material issues from the accounting firm's most recent quality control review and the steps taken by the accounting firm to address any quality control issues.

- Establishing a policy on provision of non-audit services.

- Pre-approving all audit and permitted non-audit services provided to the Company in compliance with law and SEC rules and delegating, at the

Committee's discretion, responsibility for decisions regarding pre-approval of non-audit services to one or more Committee members.

- Determining and instituting a procedure for (1) receiving and treating complaints received by the Company regarding accounting, internal audit controls and auditing matters and (2) receiving confidential, anonymous reports from employees of the Company regarding questionable accounting or auditing matters.

- Receiving reports from and reviewing with the accounting firm (1) all critical accounting policies and practices used in connection with the Company's periodic reports; (2) all alternative treatments of financial information that have been discussed with management, the ramifications of those alternative treatments and the treatments preferred by the accounting firm; and (3) any management letter, schedule of unadjusted differences or other material written communications between the firm and management including any disagreements with management.

- Reviewing the Company's annual audited financial statements and periodic reports that include financial statements prior to filing or distribution and reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Conditions & Results of Operations. The reviews should include a quarterly meeting with each of management, internal audit personnel and the independent auditors to discuss significant issues regarding accounting principles, practices, and judgments and reviewing all significant correcting adjustments (whether or not made) to ensure all material adjustments are properly reflected in the Company's financial reports.

- Discussing, generally, all financial press releases, other financial information and earnings guidance provided to analysts and rating agencies including discussions of pro forma information to verify that the pro forma information includes reconciliation to comparable GAAP information and does not give undue prominence to the pro forma information or otherwise provide misleading presentations of results of operations or financial condition.

- Reviewing the processes and procedures by which the Company conducts the due diligence necessary to support the certification requirements of Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

- Reviewing the audit plans, performance and reports of the internal audit function.

- Engaging, from time to time as they may deem necessary and without further Board approval, legal, accounting and other advisors.

- Reviewing, at least annually, the performance of the Audit Committee and reviewing and amending (as necessary) the Committee's Charter, submitting the Charter to the Board of Directors for approval and authorizing the Charter to be published on the Company's website and disclosed in the Company's proxy statement as required by SEC and NYSE rules.

- In consultation with management, the independent auditors, and the internal auditors, reviewing and discussing significant financial risk exposures and the steps management has taken to monitor, control, and report such exposures.

- Providing an annual report to shareholders as required by the SEC to be included in the Company's annual proxy statement and Form 10K stating whether the Committee has complied with its responsibilities under the Charter.

- Advising the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Code of Business Conduct and Ethics, particularly as it relates to the Company's senior financial officers.

- Reviewing with the Company's General Counsel legal matters that may have a material impact on the financial statements, the Company's compliance policies and any material report or inquiries received from regulators or government agencies.

- Establishing a clear policy for hiring of former employees of the outside auditor.

- Reviewing any financial transactions in which the Company and a related party, as defined in the Company's Related Party Transaction Policy and Regulation SK, has a direct or indirect interest.

- Performing any other activities consistent with this Charter, the Company's bylaws, and governing law, as the Committee or the Board deems necessary or appropriate.

- Maintaining minutes of meetings and periodically reporting to the Board of Directors on significant results of the foregoing activities.

### *Compensation Committee Duties*

78.     In addition to these duties, the members of the Compensation Committee owed specific duties to CIBER under the Compensation Committee's Charter to evaluate and approve the compensation of the Company's executive officers and to monitor the Company's overall compensation policies and practices.  In particular, the Compensation Committee's Charter provided as follows:

The Committee's duties, responsibilities and authority include:

- Reviewing and determining the Company's philosophy, policies and procedures regarding executive compensation and approving corporate goals and objectives as they relate to the compensation of the CEO and the other Executive Officers;

- Evaluating the performance of the CEO and the other Executive Officers based on those corporate goals and objectives;

- Reviewing and determining the CEO and other Executive Officers' compensation based on the performance evaluation and determining that such compensation is reasonable and competitive;

- Reviewing and approving periodically and as and when appropriate, the CEO and the other Executive Officers' compensation, including the following: (a) all incentive awards and opportunities, including both cash-based and equity-based awards and opportunities; (b) any employment agreements and severance arrangements; (c) any change-in-control agreements and change-in-control provisions affecting any elements of compensation and benefits; and (d) any special or supplemental compensation and benefits for the CEO and the other Executive Officers;

- Reviewing and approving, periodically and as and when appropriate, the cash and equity compensation and benefits, if any, provided to the Company's nonemployee directors;

- Determining stock ownership guidelines for the non-employee directors, CEO and other Executive Officers and monitor compliance with such guidelines:

- Overseeing all matters relating to compensation risk assessment;

- Receiving periodic reports on the Company's compensation programs as they affect all employees generally;

- Providing recommendations to the Board on compensation related proposals to be considered at the Company's annual meeting of stockholders, including the approval of executive compensation ("say-on-pay" votes), and the frequency of such votes ("say-when-on-pay"), and reviewing the results of stockholder votes on such proposals and considering implications;

- Reviewing and discussing with the CEO and reporting to the Board plans for Executive Officer development and corporate succession plans for the CEO and Executive Officers;

- Selecting and retaining, in its sole discretion and at its sole authority, any compensation consultant to assist in the evaluation of director, CEO and other Executive Officer compensation and determining the extent of such consultant's engagement;

- Reviewing and discussing with management the Company's Compensation Discussion and Analysis ("CD&A") required to be included in the Company's proxy statement and annual report on Form 10-K by the rules and regulations of the Securities and Exchange Commission;

- Producing the annual Compensation Committee report for inclusion in the Company's proxy statement in compliance with the rules and regulations of the Securities and Exchange Commission;

- Reporting to the Board the Committee's decision regarding CEO and other Executive Officer compensation including cash-based and equity-based compensation plans;

- Administering and making grants under the CIBER, Inc. 2004 Incentive Plan;

- Recommending to the Board, and for stockholder approval where required, changes in or the adoption of equity compensation plans, specifically employee equity plans; and

- Reviewing, at least annually, the performance of the Committee and reviewing and amending (as necessary) the Committee's Charter, submitting to the Board this Charter and any amendments for the Board's review and approval and providing for the posting of the Charter to the Company's website as required by SEC rules and NYSE requirements.

### Control, Access, and Authority

79.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of CIBER, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by CIBER.

80.    Because of their advisory, executive, managerial, and directorial positions with CIBER, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of CIBER.

81.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CIBER, and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

82.    To discharge their duties, the officers and directors of CIBER were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of CIBER were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

(b)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)     remain informed as to how CIBER conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that CIBER was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

83.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to CIBER and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of CIBER, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of

CIBER, the absence of good faith on their part, and a reckless disregard for their duties to CIBER and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to CIBER.

84.    The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements, or by failing to take any actions to correct the false and/or misleading statements.    The false and misleading statements misled shareholders into believing that CIBER's organizational and management "transformation" was operating successfully and would not have an adverse effect on the Company's financial condition, including its revenues, gross margins, or profitability, and that the Company was improving reporting and accountability at a managerial level. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, CIBER has expended, and will continue to expend, significant sums of money to rectify the Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

85.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

86.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that CIBER's organizational and management "transformation" was operating successfully and would not have an adverse effect on the Company's financial condition, including its revenues, gross margins, or profitability, and that the Company

was improving reporting and accountability at a managerial level.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

87.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment and waste of corporate assets; and (b) disguise and misrepresent the Company's future business prospects.

88.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

89.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

### DAMAGES TO CIBER

90.     As a result of the Individual Defendants' wrongful conduct, CIBER disseminated false and misleading statements.   The improper statements have devastated CIBER's credibility.  Additionally, CIBER is now the subject of a securities fraud class action lawsuit.  The Company will face substantial costs in connection with an investigation and the lawsuit.

91.     As a direct and proximate result of the Individual Defendants' actions as alleged above, CIBER's market capitalization has been substantially damaged.

92.     Further, as a direct and proximate result of the Individual Defendants' conduct, CIBER has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending CIBER and certain officers in a class action lawsuit, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b)     costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on CIBER's artificially-inflated stock price and inflated revenues; and

(c)     costs incurred from the loss of the Company's customers' confidence in CIBER's services.

93.     Moreover, these actions have irreparably damaged CIBER's corporate image and goodwill.  For at least the foreseeable future, CIBER will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that CIBER's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

94.     Plaintiff brings this action derivatively in the right and for the benefit of CIBER to redress injuries suffered, and to be suffered, by CIBER as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  CIBER is named as a nominal defendant solely in a derivative capacity.

95.    Plaintiff will adequately and fairly represent the interests of CIBER in enforcing and prosecuting its rights.

96.    Plaintiff was a shareholder of CIBER common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

97.    Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

98.    At the time this action was commenced, the Board of CIBER consisted of the following eight Defendants: Peterschmidt, Jacobs, Stevenson, McGill, Kurtz, Spira, Lauk, and Heitz.

### Demand is Futile as to Defendant Peterschmidt

99.    Defendant Peterschmidt faces a substantial likelihood of liability for his individual misconduct.  Peterschmidt is a named defendant in a federal class action pending in the District of Colorado alleging that he and the Company violated §10(b) of the 1934 Act and Rule 10b-5 when he disseminated or approved false statements.

100.   If Defendant Peterschmidt pursued these derivative claims, then that would expose his own misconduct in the class action for violations of the federal securities laws.  This, in turn, would impair the defense of the class action and greatly increase the probability of Defendant Peterschmidt's personal liability in the class action.  As such, Defendant Peterschmidt is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims.  Thus, demand is futile as to Defendant Peterschmidt.

101.   Additionally, Defendant Peterschmidt cannot render an independent decision because he is and was a high-ranking officer of CIBER during the time period

when the wrongdoing occurred.  Defendant Peterschmidt has served as the CEO and a director of CIBER's Board since July 2010, and oversaw the entire Company-wide transition during the Relevant Period.  According to relevant portions of the Company's 2011 proxy statement, Defendant Peterschmidt is not an independent director.  Thus, Defendant Peterschmidt is a current Company insider and therefore cannot independently consider a demand.

102.   Additionally, Defendant Peterschmidt is interested because he issued many of the false and misleading statements.  Defendant Peterschmidt therefore faces a substantial likelihood of liability for breaching his fiduciary duties to CIBER shareholders.  Consequently, Defendant Peterschmidt cannot disinterestedly consider a demand.

### Demand is Futile as to Defendant Stevenson

103.   Defendant Stevenson faces a substantial likelihood of liability for his individual misconduct.  Defendant Stevenson was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.  Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Stevenson faces a substantial likelihood of liability.  For this reason demand is futile.

104.   Additionally, Defendant Stevenson cannot render an independent decision because he is and was a high-ranking officer of CIBER during the time period when the

wrongdoing occurred.  Defendant Stevenson founded CIBER and served as its CEO from 1977 to 1998.  He also has served as a director of the Company since its founding. Such a close intertwined relationship with the Company renders Defendant Stevenson interested and not sufficiently independent to disinterestedly consider a demand to bring suit in this case.  For this reason, according to relevant portions of the Company's 2011 proxy statement, Defendant Stevenson is not an independent director.  Thus, Defendant Stevenson is a current Company insider and therefore cannot independently consider a demand.

105.  Further, Defendant Stevenson receives additional benefits from the Company as established at the time of his resignation as Chairman of the Board on April 11, 2010.  According to the Company's 2011 proxy statement, these benefits include:

(a)    office space through July 31, 2016;

(b)    administrative support through December 31, 2013;

(c)    health care insurance for Defendant Stevenson and his spouse while he is a member of the Board and for three years after Defendant Stevenson ceases to be member of the Board;

(d)    long-term care insurance for Defendant Stevenson's spouse; and

(e)     membership dues and fees at Castle Pines Golf Club and Glenmoor Country Club through 2013.

106.  In 2012, despite Defendant Stevenson's long-standing relationship with the Company as a founder and former CEO, and the additional benefits that Defendant Stevenson continues to receive, the Board selected Defendant Stevenson as a member

- 49 -

of the Audit Committee and found that he had the "requisite independence" for membership.

### Demand is Futile as to Defendant Heitz

107.   Defendant Heitz faces a substantial likelihood of liability for his individual misconduct.  Defendant Heitz became a director on June 14, 2011, during the end of the Relevant Period when the Individual Defendants were continuing to cause the Company to publish false and misleading statements.  As such, Defendant Heitz had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.  Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Heitz faces a substantial likelihood of liability.  For this reason demand is futile.

108.   Defendant Heitz also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee.  As an Audit Committee member, Defendant Heitz was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. However, he utterly failed and/or refused to do so during the Relevant Period when Defendant Peterschmidt and others made wholly unsupportable financial projections that caused the Company's stock to trade at artificially inflated prices.   For this additional reason demand is futile.

109.   Defendant Heitz also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Compensation Committee.   As member of the Compensation Committee, Defendant Heitz approved excessive and unwarranted compensation and bonus awards in breach of his fiduciary duties.  For this additional reason demand is futile.

### Demand is Futile as to Defendant Jacobs

110.   Defendant Jacobs faces a substantial likelihood of liability for his individual misconduct.  Defendant Jacobs was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Jacobs faces a substantial likelihood of liability.  For this reason demand is futile.

111.   Additionally, Defendant Jacobs cannot render an independent decision because he specifically failed in his obligation to provide truthful information about the Company's transition.  Defendant Jacobs has served as a director of the Company since 2005, and has served as its Chairman since April 11, 2010, before the commencement of the Relevant Period.  In fact, according to the Company, Defendant Jacobs himself was responsible for "guid[ing] the Board through the management transition."   Therefore, by the Company's own admission, Defendant Jacobs was charged with ensuring that the Company-wide transformation was proceeding smoothly

from a Board-level perspective.  This responsibility gave Defendant Jacobs access to and knowledge of the inner workings of the Company's transition, and as a result, gave him actual knowledge of the significant problems facing the Company during the Relevant Period.  However, rather than use this knowledge to authorize the filing of truthful and honest statements about the Company's transition, Defendant Jacobs authorized and/or failed to correct the many false and misleading statements published during the Relevant Period that caused the Company's stock to trade at artificially inflated prices.  For this additional reason demand is futile.

112.  Defendant Jacobs also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee.  As an Audit Committee member, Defendant Jacobs was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections.  However, he utterly failed and/or refused to do so during the Relevant Period when Defendant Peterschmidt and others made wholly unsupportable financial projections that caused the Company's stock to trade at artificially inflated prices.  For this additional reason demand is futile.

### Demand is Futile as to Defendant McGill

113.  Defendant McGill faces a substantial likelihood of liability for his individual misconduct.  Defendant McGill was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.  Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at

artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant McGill faces a substantial likelihood of liability.  For this reason demand is futile.

114.   Defendant McGill also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee.  As an Audit Committee member, Defendant McGill was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections.  However, he utterly failed and/or refused to do so during the Relevant Period when Defendant Peterschmidt and others made wholly unsupportable financial projections that caused the Company's stock to trade at artificially inflated prices.  For this additional reason demand is futile.

115.   Defendant McGill also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Compensation Committee.  As member of the Compensation Committee, Defendant McGill approved excessive and unwarranted compensation and bonus awards in breach of his fiduciary duties.  For this additional reason demand is futile.

### Demand is Futile as to Defendant Kurtz

116.   Defendant Kurtz faces a substantial likelihood of liability for his individual misconduct.  Defendant Kurtz was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.  Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at

artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Kurtz faces a substantial likelihood of liability.  For this reason demand is futile.

117.   Defendant Kurtz also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee.  As an Audit Committee member, Defendant Kurtz was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. However, he utterly failed and/or refused to do so during the Relevant Period when Defendant Peterschmidt and others made wholly unsupportable financial projections that caused the Company's stock to trade at artificially inflated prices.  For this additional reason demand is futile.

118.   Defendant Kurtz also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Compensation Committee.  As member of the Compensation Committee, Defendant Kurtz approved excessive and unwarranted compensation and bonus awards in breach of his fiduciary duties.  For this additional reason demand is futile.

### Demand is Futile as to Defendant Spira

119.   Defendant Spira faces a substantial likelihood of liability for his individual misconduct.  Defendant Spira was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at

artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Spira faces a substantial likelihood of liability.  For this reason demand is futile.

120.   Defendant Spira also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Compensation Committee.   As member of the Compensation Committee, Defendant Spira approved excessive and unwarranted compensation and bonus awards in breach of his fiduciary duties.  For this additional reason demand is futile.

### Demand is Futile as to Defendant Lauk

121.   Defendant Lauk faces a substantial likelihood of liability for his individual misconduct.   Defendant Lauk was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Lauk faces a substantial likelihood of liability.  For this reason demand is futile.

122.   Defendant Lauk also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee.   As an Audit Committee member, Defendant Lauk was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. However, he utterly failed and/or refused to do so during the Relevant Period when

Defendant Peterschmidt and others made wholly unsupportable financial projections that caused the Company's stock to trade at artificially inflated prices. For this additional reason demand is futile.

### Demand is Futile as to All Directors for Additional Reasons

123. If CIBER's current officers and directors are protected against personal liability for their acts of mismanagement and breaches of fiduciary duties alleged in this Amended Complaint by D&O Insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by CIBER against the Individual Defendants, known as the "insured versus insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of CIBER, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O insurance policy.

124. Under the factual circumstances described herein, the Individual Defendants are more interested in protecting themselves than they are in protecting CIBER by prosecuting this action. Therefore, demand on CIBER and its Board is futile and is excused.

125.    CIBER has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

126.    A true and correct copy of this Amended Complaint was delivered to CIBER prior to being filed with this Court.

## COUNT I
### Against the Individual Defendants for Breach of Fiduciary Duty

127.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.    The Individual Defendants owed and owe CIBER fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe CIBER the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

129.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

130.    The Individual Defendants each knowingly, recklessly or negligently (i) made false or misleading statements that misrepresented or failed to disclose material information concerning the Company, (ii) approved the issuance of such false and/or misleading statements, and/or (iii) failed to take actions to correct such false and/or misleading statements after they had been disseminated by the Company.  These

actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

131.   As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, CIBER has sustained significant damages.   As a result of the misconduct alleged herein, these Individual Defendants are liable to the Company.

132.   Plaintiff, on behalf of CIBER, has no adequate remedy at law.

## COUNT II
### Against the Individual Defendants for Unjust Enrichment

133.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

134.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CIBER.

135.   The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to CIBER.

136.   Plaintiff, as a shareholder and representative of CIBER, seeks restitution from these Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Individual Defendants from their wrongful conduct and fiduciary breaches.

137.   Plaintiff, on behalf of CIBER, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Corporate Waste

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and was on-going throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

140.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) providing benefits including golf club memberships to certain directors; (iii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

141.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

142.    Plaintiff, on behalf of CIBER, has no adequate remedy at law.


### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, and unjust enrichment;

B.    Directing CIBER to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to

protect CIBER and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of CIBER to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of CIBER's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.     Awarding to CIBER restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Dated: April 26, 2013                     JOHNSON & WEAVER, LLP

                                          *s/ Frank J. Johnson*
                                          Frank J. Johnson

- 60 -

110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
E-mail: frankj@johnsonandweaver.com

LAW OFFICES OF EVAN S. LIPSTEIN PC
EVAN LIPSTEIN
12600 W. Colfax Ave., Ste. C-400
Lakewood, CO 80215
Telephone: (303) 232-5151
Facsimile: (303) 232-5161
Email: evan@lipsteinlaw.com

*Attorneys for Plaintiff John Seni*

## VERIFICATION

I, John Seni, hereby verify that I am a shareholder of CIBER, Inc., (the "Company"), and am ready, willing, and able to pursue this action in the hope of improving the Company and recovering damages for the Company caused by the defendants' conduct. I have reviewed the allegations made in this Amended Verified Shareholder Derivative Complaint and to those allegations of which I have personal knowledge believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. Having received a copy of this Amended Verified Shareholder Derivative Complaint, and having reviewed it with counsel, I hereby authorize its filing.

I declare under penalty of perjury that the foregoing is true and correct.

Date: 4-25-2013          John Seni
                                    John Seni

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 26, 2013, I authorized the electronic filing of the foregoing document with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

Dated: April 26, 2013

By:    */s/ Frank J. Johnson*
        FRANK J. JOHNSON

## Mailing Information for a Case 1:12-cv-00320-REB-CBS

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jonathan S. Bender**
  jsbender@hollandhart.com,intaketeam@hollandhart.com

- **Boris Feldman**
  boris.feldman@wsgr.com,ncarvalho@wsgr.com

- **Frank James Johnson**
  frankj@johnsonandweaver.com,paralegal@johnsonandweaver.com,shawnf@johnsonandweaver.com,ceciliar@johnsonandweaver.com

- **Evan S. Lipstein**
  evan@lipsteinlaw.com,evelyn@lipsteinlaw.com

- **Elizabeth C. Peterson**
  epeterson@wsgr.com,bbahns@wsgr.com,lbeltran@wsgr.com

- **Holly Stein Sollod**
  hsteinsollod@hollandhart.com,showard@hollandhart.com,intaketeam@hollandhart.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)