**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.: 12-CV-00320-REB-CBS**

JOHN SENI, Derivatively on Behalf of CIBER, INC.,

        Plaintiff,

   v.

DAVID C. PETERSCHMIDT,
CLAUDE J. PUMILIA,
PETER H. CHEESBROUGH,
PAUL JACOBS,
STEPHEN S. KURTZ,
KURT J. LAUK,
ARCHIBALD J. MCGILL, and
JAMES C. SPIRA,

        Defendants,

and

CIBER, INC.,

        Nominal Defendant.

---

**SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT
FOR BREACH OF FIDUCIARY DUTY,
UNJUST ENRICHMENT AND CORPORATE WASTE**

---

By and through his undersigned counsel, Plaintiff John Seni ("Plaintiff") hereby submits this Second Amended Verified Shareholder Derivative Complaint (the "Second Amended Complaint") on behalf of CIBER, Inc. ("CIBER" or the "Company") and against certain current and former officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, corporate waste and aiding and abetting thereof.

## INTRODUCTION

1.      This action arises out of the Individual Defendants' decision to issue materially false and misleading statements concerning CIBER's financial results and business prospects in connection with a Company-wide transformation and leadership transition in 2010 and 2011.  The issuance of these materially false and misleading statements has significantly damaged CIBER by, *inter alia*, causing the destruction of millions of dollars of market capitalization and shareholder value after the full truth was revealed on August 3, 2011, causing the Company to expend precious corporate resources defending itself and certain of the Individual Defendants in a related securities fraud class action (the "Class Action"), and causing the Company to pay a **$3 million settlement** to resolve the Class Action.

2.      As described in more detail below, Defendants Peterschmidt, Cheesbrough, and Pumilia, individually and on behalf of the Company, made false and misleading statements in public filings, press releases, and conference calls that touted the Company's positive financial results, significant growth, and presented aggressive forward guidance.  The remaining Individual Defendants, including Defendants Jacobs, Kurtz, Lauk, McGill, and Spira, each gained contemporaneous, direct access to non-public facts demonstrating that these public statements were materially false and

misleading.   However, not one of these defendants took action to correct the misstatements in violation of their fiduciary duties to CIBER and its shareholders.

3.   In particular, Defendants Peterschmidt, Cheesbrough, and Pumilia (the "Officer Defendants") described a wholesale overhaul of CIBER's organizational and managerial structure, as well as the implementation of new strategic initiatives designed to improve the Company's financial performance.  The Officer Defendants consistently and doggedly stressed that this "transformation" would improve the Company's worldwide financial performance.  When questioned about the impact of the Company's wholesale transition on CIBER's financial results, and particularly how the Company could embark on such a large scale transition without any negative effect on performance, Defendant Peterschmidt steadfastly rebuffed notions that the overhaul would adversely affect CIBER's financial performance going forward or its ability to achieve its business outlook.

4.   Similarly, the Officer Defendants consistently maintained that the Company had an effective system of internal and disclosure controls in place concerning its financial reporting, and that the Company's financial performance during the transition would be adequately and accurately reported as a result.

5.   However, unbeknownst to the public, the Company faced significant charges arising from legacy contracts entered into in or before 2009, and substantial weakness in sales in its North American sector, which accounted for nearly half of the Company's total revenues in 2010 and 2011.  These two significant issues, which went entirely undisclosed, significantly affected the Company's financial performance, in direct contradiction to the Officer Defendants' aggressive projections.   Moreover,

contrary to the statements made by the Officer Defendants, the Company's "transformation" made it more difficult to deal with these problems, which further affected the Company's financial performance.

6.     The falsity of these statements was not discovered in hindsight by the Individual Defendants, but was known or recklessly disregarded at the time the statements were made.  Indeed, the Officer Defendants repeatedly touted their intimate level of knowledge about the Company's existing legacy contracts and internal operational and disclosure controls problems.  Moreover, the Individual Defendants implemented a robust review and oversight regime designed specifically to give management and the Board direct, real-time access to information concerning the progress and timing of the transformation.  For example, the Officer Defendants met weekly in a Deal Review Committee to review problematic legacy contracts.  They also met in a Quarterly Business Review meeting to discuss with other senior officers the progress and any setbacks of all aspects of the transformation.

7.     The Board also implemented transformation-specific review and oversight protocols to give it real-time information about the transition.  The Board created a Search Committee in early 2010 to identify candidates for senior executive positions who specifically could provide beneficial expertise to the transition.  The Board also created a Transition Committee with the express mandate to exercise careful review and oversight over the transformation.  In addition, the Company appointed Defendant Jacobs to "guide the Company through the transition" and ensure that adequate communication and cooperation existed between the Board and management as they jointly implemented the Company-wide overhaul.  In this unique role, Jacobs gained

direct access to specific, nonpublic facts about significant problems and risks facing CIBER throughout 2011 as a result of the transformation.

8.     As a result of the Individual Defendants' efforts to mislead the market, the Company's stock price artificially increased nearly 100% in the first half of 2011.

9.     However, the Individual Defendants' attempts to mislead the market came to a crashing halt when they were forced to admit publicly what had long been known privately.   On August 3, 2011, the Company issued a press release and held an earnings conference call reporting financial results that were "significantly below … expectations," and announcing that it would suspend its full-year 2011 guidance due to "sales weakness in North America, [and] changes in estimates on five [fixed-price] projects that were signed in 2009 or earlier, and required adjustments to the balance sheet."   The underperforming five fixed-price contracts resulted in $13.4 million in charges against the Company's quarterly revenue and earnings.   Further, the Company disclosed a disappointing 23% decline in revenue for its North American operations. When the Company revealed the truth about its business health, CIBER's stock price plummeted $1.22 or approximately 23.6% in a single day, closing at just $3.94 per share on August 3, 2011 on extraordinarily high-volume trading.   By August 29, 2011, the stock price had fallen to only $2.91 per share, a decline of almost 58% from the high on April 6, 2011.

10.    The Individual Defendants' detailed, specific, contemporaneous knowledge of problems facing the Company was acknowledged by Peterschmidt on August 3, 2011 when the truth about the transition was revealed.   In a conference call attempting to explain to blindsided investors and analysts what had happened,

Peterschmidt admitted that despite his earlier aggressive statements, the "shortfall in North American sales and revenue production … [was] *not completely unforeseen*," thus admitting knowledge of this material, adverse, and undisclosed fact.

11.    CIBER's Board has not, and will not commence litigation against defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to CIBER for authorizing or failing to correct the false and misleading statements alleged herein.  Accordingly, a pre-suit demand upon the CIBER Board is a useless and futile act.  Thus, Plaintiff rightfully brings this action to vindicate CIBER's rights against its wayward fiduciaries and hold them responsible for the damages they have caused CIBER.  More specifically, Plaintiff brings this derivative action to (i) recover damages against CIBER's officers and directors for the benefit of the Company and (ii) require the Company to reform and improve its corporate governance and internal procedures to protect CIBER and its shareholders from a repeat of the damaging events described below.

## JURISDICTION AND VENUE

12.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity between Plaintiff and Defendants, and the amount in controversy exceeds $75,000.

13.    This Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in Colorado, or is an individual who has sufficient minimum contacts with Colorado so as to render the exercise of jurisdiction by the Colorado courts permissible under traditional notions of fair play and substantial justice.  This action is not a collusive one to confer jurisdiction on this Court which it would not otherwise have.

14.     Venue is proper in this Court pursuant to 28 U.S.C § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Individual Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting in violation of fiduciary duties owed to CIBER occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

### THE PARTIES

15.     Plaintiff John Seni purchased CIBER common stock on January 6, 2011, and has continuously held the stock ever since.  Plaintiff is a resident of Illinois.

16.     Defendant CIBER is a Delaware corporation with principal executive offices located at 6363 South Fiddler's Green Circle, Suite 1400, Greenwood Village, Colorado.   CIBER is a global information technology ("IT") consulting, services, and outsourcing company applying practical innovation through services and solutions that deliver tangible results for both commercial and government clients.   The services offered by CIBER include application development and management, enterprise resource planning implementation, change management, project management, systems integration, infrastructure management and end-user computing, and strategic business and technology consulting.

17.     Defendant Peterschmidt is CIBER's President, CEO, and a director and has been since July 2010.  By the Company's admission, Defendant Peterschmidt is an "inside" director.    Defendant Peterschmidt received $2,985,084 in total

compensation in 2011, and $1,154,307 in 2012.  Defendant Peterschmidt is a resident of Colorado.

18.     Defendant Claude J. Pumilia ("Pumilia") is CIBER's Executive Vice President, Chief Financial Officer ("CFO"), and Treasurer and has been since April 2011.  Defendant Pumilia received $3,425,057 in total compensation in 2011, and $1,612,054 in 2012.  Defendant Pumilia is a resident of Colorado.

19.     Defendant Peter H. Cheesbrough ("Cheesbrough") was CIBER's Executive Vice President and CFO from October 2007 to April 2011; Treasurer from February 2008 to April 2011; a director from November 2002 to April 2011; and Interim CEO and President from April 2010 to July 2010.  Defendant Cheesbrough received $1,295,605 in total compensation in 2011.  Defendant Cheesbrough is a resident of Colorado.

20.     Defendant Paul A. Jacobs ("Jacobs") is the Chairman of the Board of CIBER, and is a member of the Audit Committee and the Chair of the Nominating/Governance Committee.  Jacobs began serving on the Board in 2005 and became Chairman on April 11, 2010.   According to CIBER, after assuming the chairmanship, Defendant Jacobs "guided the Board through the management transition."  Defendant Jacobs is a resident of Colorado.

21.     Defendant Archibald J. McGill ("McGill") has served as a director of CIBER since 1998.  He currently is a member of the Audit and Compensation Committees.  Defendant McGill is a resident of Arizona.

22.     Defendant Stephen S. Kurtz ("Kurtz") is a director of CIBER, and is the Chairman of the Audit and Compensation Committees.  Defendant Kurtz has served as a director since December 2007.  Defendant Kurtz is a resident of Colorado.

23.     Defendant James C. Spira ("Spira") is a director of CIBER, and is a member of the Compensation and Nominating/Governance Committees.  Defendant Spira served as a director from 1994 to 1998 and again from 2002 to the present. Defendant Spira is a resident of Ohio.

24.     Defendant Kurt J. Lauk ("Lauk") is a director of CIBER, and is a member of the Audit Committee.  Defendant Lauk is a resident of California.

25.     Defendants Peterschmidt, Pumilia, Cheesbrough, Jacobs, McGill, Kurtz, Spira, and Lauk are sometimes collectively referred to herein as the "Individual Defendants."  Defendants Peterschmidt, Jacobs, McGill, Kurtz, Spira, and Lauk are sometimes collectively referred to herein as the "Director Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Ciber is a global information technology consulting, services and outsourcing company.  The Company provides value-priced services for both private and governmental sector clients.    Services include application development and management, enterprise resource planning ("ERP") implementation, change management, project management, systems integration, infrastructure management and end-user computing, as well as strategic business and technology consulting. Before 2011, CIBER classified its operations under five reportable segments (2010 Revenue as percentage of Company revenue): International (36%), Custom Solutions (34%), U.S. ERP Solutions (12%), Federal (11%), and IT Outsourcing (7%).

27.     On April 12, 2010, CIBER announced the retirement of its long-time CEO, Mac Slingerlend, on the heels of the Company's February 2010 report of steep drops in fourth-quarter and full-year 2009 earnings, coming well short of Wall Street expectations.  Shortly after this announcement, the Board formed a Search Committee composed of Defendants Kurtz and McGill and non-defendant James Wetherbe and tasked this committee with finding a new CEO who could, among other things, address CIBER's revenue shortfalls.

### CIBER Hires Peterschmidt as CEO, Who Embarks on a Company-Wide "Transformation"

28.     On July 1, 2010, CIBER announced the hiring of Peterschmidt as the Company's new CEO.  Reflecting the Search Committee's recognition during its search that CIBER's revenue shortfalls stemmed at least partly from a lack of operational rigor and efficiency, Board Chairman Defendant Jacobs stated in the press release that, "[w]e conducted an extensive search and were impressed with Dave's . . . focus on operational discipline . . . which will position CIBER for reinvigorated growth."   In apparent recognition of this issue, Peterschmidt stated in the release that, "[m]y initial focus will be to streamline operations across the company . . ."

29.     Over the next four months, Peterschmidt reviewed CIBER's operations and financial health and identified a number of systemic problems with the Company's existing customer contracts, sales force, IT infrastructure, and operational discipline. As a result of this review, in November 2010 Peterschmidt and the other Individual Defendants caused CIBER to announce plans for a major restructuring of the Company's operations to consolidate its Custom Solutions and substantially all of its ERP business units into a new "North America" reporting until in the beginning of 2011.

30.    The Individual Defendants provided significant additional details of the restructuring on December 15, 2010, when the Individual Defendants caused CIBER to release a presentation entitled "Vision Update and Roadmap for Future Success," which was accompanied by a conference call to market analysts with Defendants Peterschmidt and Cheesebrough.   Both the presentation and the comments made during the conference call provided specific details about the systemic problems that currently existed at CIBER, and the key initiatives being pursued to fix these problems.

31.    With respect to systemic problems, Peterschmidt stated:

First off, this was a very fractured Company.  This Company was operating in silos, even to the extent of silos where North America was not communicating with Europe.  Divisions within North America were not communicating with each other, so what you in essence had was not a billion dollar corporation.  You had a holding company of about 36 smaller companies so you had no leveraged effect out of all of the invested assets that were in this Company.  They were all fractionalized, no leverage.

The other thing that we did is we looked at that and said, okay, it's time to get everybody together.  Let's break down the communication silos and let's get this Company moving.  So in July we brought 12 of the executives in from around the world, brought in an outside facilitation firm that I had used for 30 years that has worked with companies like AT&T to build their strategic plans.  From that we built a strategic plan.  And what you are going to see today is the outcome of that strategic planning session operationalized into a three-year operating plan, so that is where this came from.

The Company also had little or no operating discipline or regimen.  I am amazed because my experience in growing and scaling companies is you cannot scale companies unless you have structure and process and this Company had little or any of those.  Again, it was more a small operating unit in a city almost operating as a fiefdom, not the professional discipline that I had become accustomed to in running high-tech companies.

Okay.  This is what we have been faced with.  This was my first analysis, first off, fragmented as I told you.  We were operating in silos.  North America had 35 to 36 separate branch offices, each one of them self-contained and not communicating or working across function with each other. Tony is going to show you that is gone now.

We have got profit leaks all over the place in this Company. Let me give you an example of what I mean by a profit leak. We will have a contract term out there that says we are not going to get paid until we deliver the final product, but we do not have a term in our contract that says if you change the scope of the deliverable we get to stop right there and settle up our accounts and then go on from there to set the new deliverable date.

This Company has projects where it has invested $2 million and $3 million and has this constant creeping scope and could end up investing another $2 million before it got paid. It is a crazy way to run a business in this environment. We are changing all of that.

We have got situations where we fundamentally blew it in the delivery of a project and we didn't stop and go, wait a second, we are way over budget. And as a result of that our expense is greater than what we are getting paid for the project. Some of these things were just incomprehensible to me, no systems and no oversight to fix these types of problems. That is what I mean by the profit leaks.

32.     To address these issues, Peterschmidt caused the Company to adopt the following four "key initiatives":

- Create a tighter focus on specific market verticals

- Develop a world-class sales force

- Enhance our IT infrastructure

- Instill operating regimens

**The Individual Defendants Implement a Rigorous Oversight Structure Designed to Closely Monitor the Progress of the Transformation**

33.     Having decided to embark on a wholesale, Company-wide restructuring of CIBER's reporting units, strategic focus, sales force, IT infrastructure, and operations, the Individual Defendants created a rigorous oversight structure designed to regularly monitor the progress of the transformation. Each Individual Defendant participated in one or more aspect of this new oversight structure. In particular, the following committees/groups were created or expanded:

34.   <u>Deal Review Committee</u>: Concurrently with announcing the restructuring, the Individual Defendants created a "Deal Review Committee" tasked with reviewing all existing customer contracts to identify potentially problematic low-margin legacy contracts, and with reviewing any potential new contracts to determine if it passed the Company's new stricter guidelines.   As Defendant Peterschmidt explained on December 15, 2010, the Deal Review Committee engaged in a "very deep evaluation of all of [CIBER's] contracts," and also reviewed any potential new contracts thusly: "Any deal now that is $1 million or more cannot be presented to the customer until is has passed the deal review committee.   The deal review committee is made up of ***myself, the operating division chiefs, [Cheesebrough], legal, [and] HR***.   It is every aspect of the company."   An April 2011 presentation to shareholders confirmed that the committee's work was ongoing and provided this additional detail about the committee's work: "[W]e've established a deal review committee to scrutinize, ***on a weekly basis***, significant deals to make sure they pass muster in terms of our strategic focus . . . [the committee is] an example of how we've ***centralized decision-making***, and unified the company's pursuit of performance benchmarks."

35.   <u>Quarterly Business Review</u>: Peterschmidt initiated what was internally called a "Quarterly Business Review" meeting in September 2010, during which Peterschmidt, Cheesebrough (and then later, Pumilia), and other senior officers met with various department personnel to discuss updates on all aspects of the Company, including progress and setbacks with respect to the key initiatives.   At these meetings, the Officer Defendants regularly discussed and were updated on existing problematic

legacy contracts whose low margins did not fit the Company's new strategic vision and threatened the Company's financial health.

36.     Search Committee: The Board initially created the Search Committee in April 2010 to aid the Company in finding a qualified CEO to address CIBER's declining financial health.  The Search Committee's role expanded throughout 2010 and 2011 as it was tasked with finding qualified executives who could beneficially aid Defendant Peterschmidt's planned Company-wide transformation.  The members of the Search Committee were Kurtz, McGill, and non-defendant James Wetherbe.

37.     Transition Committee: The Board also created the Transition Committee in November 2010, in conjunction with the announcement of the Company-wide transformation.  This Board-level committee was tasked with exercising careful oversight of the progress and timing of the transformation, and with regularly consulting with senior management as it engaged in the transition.  The members of the Transition Committee were Kurtz, Spira, and non-defendant Wetherbe.

**The Individual Defendants Make, Authorize, or Fail to Correct Materially Misleading Statements About the Transformation**

38.     Throughout late 2010 and much of 2011, the Individual Defendants made (or caused CIBER to make) numerous materially false or misleading statements about the progress of the transformation and its impact on the Company's financial health and internal controls.  These materially false and misleading statements caused CIBER's stock to trade at artificially inflated prices until the truth was revealed on August 3, 2011, after which the Company's stock plummeted over 23% in one day.

39.     For example, during CIBER's December 15, 2010 "Vision Update and Roadmap to Future Success" presentation, Peterschmidt and Cheesebrough repeatedly

claimed that all of the problematic legacy contracts at CIBER would be identified and addressed by the end of 2010.   Defendant Cheesbrough explained that CIBER previously had focused on too many lower margin contracts that had put "our profitability . . . below par and significantly below the performance of our competitors." However, Defendant Cheesbrough stressed that the Company would no longer be burdened by this low margin contracts, because the Company "***ha[s] already walked through a number of actions which include runoff of existing lower margin business. . . . We have already put a stop to the growth in this type of project.***"

40.   During the December 15, 2010 analyst conference, Defendant Peterschmidt also responded to analyst questions regarding what the Company was doing about problematic contracts:

George Price – BB&T Capital Markets – Analyst

*        *        *

You – in the guidance you included potential action on contracts, charges related to contracts and you really touched on that specifically.  Can you talk a little, tell us what you can about what we might expect in the fourth quarter related to contract actions and do you anticipate – is that going to be kind of once and done, or is that going to be any potential lingering process as you go into 2011, through 2011?

In response to this question, defendant Peterschmidt stated:

*        *        *

Yes, sure, sure.  Again, we are trying to get everything done in the fourth quarter than anything that we are looking at in the way of problematic contracts that have been hanging out there for two or three years we want to get most of that wrapped up and taken care of by the end of the fourth quarter. We are still doing a very deep evaluation of all of our contracts right now, but ***I am pretty confident we can wrap that up by the end of the fourth quarter. I am trying not to carry anything over into Q1.***

41.   These statements were false and misleading when made, because:

a) The deal review committee had not yet even adequately identified all problematic fixed-price contracts, much less evaluated and addressed potential issues.

b) The Company, in part due to the Company-wide overhaul, lacked the operational discipline, process and controls to adequately identify and address the problematic legacy contracts.

42.    The same day, CIBER filed a Form 8-K with the SEC announcing the meeting, and attached slides that it would present at the meeting as well as its press release formally announcing the meeting.  In both the slides and the press release, the Company presented its long-term business outlook and 2011 guidance, as follows:

CIBER's long-term objectives include:

- Double-digit revenue growth annually
- Gross profit margin exceeding 30%
- Operating income margin exceeding 8%
- Double-digit earnings per share growth annually

***For 2011, a year the company called a first step in achieving its long-term objectives, the company expects:***

- ***Revenue growth to exceed 4.0%***
- ***Gross profit margin to exceed 25.5%***
- ***Operating income margin to exceed 3.5%***
- ***Earnings per share to exceed $0.30***

43.    In the press release, Defendants Peterschmidt and Cheesbrough trumpeted the Company's projected growth and prosperity.  Defendant Peterschmidt proclaimed that the Company had "***developed a strategic plan and instilled stricter operational regimens***," the "key elements" of which included "a tighter focus on [CIBER's] market approach, development of a world-class sales force, and enhancements to [the Company's] information technology infrastructure."

44.   On the December 15, 2010 conference call, Defendant Cheesbrough reiterated this extremely aggressive financial guidance for FY 2011:

> Moving on to 2011, this is a transitional year where we are laying the groundwork to achieve the improved performance expected in the long-term model. **For 2011 we see revenue growth of more than 4%, focusing on the right quality deals, more focused than in the past, gross profit of around 25.5% with improvement coming from higher quality deals, increased offshore delivery, better quality management of projects as well as other practices we have reviewed this mornings, operating margins exceeding 3.5% driven by the improvement in gross margin and efficiencies from streamlining North American operations**.

45.   The statement that CIBER had already "instilled stricter operational regimens" was false and misleading when made because:

a) Each of the Individual Defendants knew that the deal review committee had not yet even adequately identified all problematic fixed-price contracts, much less evaluated and addressed potential issues related to those contracts.

b) Each of the Individual Defendants knew that the Company, in part due to the Company-wide overhaul, lacked the operational discipline, process and controls to adequately identify and address the problematic legacy contracts.

46.   Further, the statements announcing FY 2011 were false and misleading and lacked a reasonable basis when made because:

a) The Company faced substantial weakness in sales in its North American sector, which accounted for over a third of the Company's total revenues during the Relevant Period, with no indication that this weakness would not continue.

b) The Company had significant legacy contracts entered into in or before 2009 that were unprofitable and carried a high risk of additional losses.

c) The Company, in part due to the Company-wide overhaul, lacked the operational discipline, process and controls to adequately identify and address the problematic legacy contractsIn response to these December 15, 2010 statements, the price of CIBER's stock increased 6.1% from a prior-day close of $3.77 per share to a close of $4.00 per share on December 15, 2010.

47.   On February 22, 2011, CIBER issued a press release announcing its financial results for both the fourth quarter and the 2010 fiscal year ended December 31, 2010.  In the press release, Defendant Peterschmidt raved that the Company was "undergoing an important transformation," and that CIBER had "set into motion a detailed and focused strategic plan and ***put in place the operational regimens necessary to achieve sustained and predictable performance*** and to increase shareholder value."  He expressed his optimism for the Company's prospects in 2011, adding: "We have entered 2011 with a tighter focus, increased discipline, a more efficient model and we continue to see general economic improvements in many markets."  Accordingly, management reaffirmed its long-term outlook and guidance for 2011, as follows:

Long term outlook:
- Double-digit revenue growth
- Gross profit margin exceeding 30%
- Operating margin exceeding 8%
- Double-digit [Earnings Per Share ("EPS")] growth
- Cash flow from operations to approximate net income

***2011 expectations:***
- ***Revenue growth exceeding 4%***

- ***Gross profit margin exceeding 25.5%***
- ***Operating margin exceeding 3.5%***
- ***EPS exceeding $0.30***
- ***Tax rate in the mid thirties***
- ***Cash flow from operations of approximately $30 million***
- ***Capital expenditures of approximately $20 million, mostly to fund IT infrastructure improvements and the India build-out***

2011 Key Success Factors
- Higher quality deal wins in key verticals
- Improved [Days' sales outstanding ("DSO")] and cash collection
- Gross and operating margin improvement
- Expanded India delivery
- Enhanced operational execution

48.    That same day, in an earnings conference call, Defendants Peterschmidt and Cheesbrough reiterated the Company's financial results and business outlook presented in the press release.  As to issues concerning "fixed price project overruns [and] problematic legacy engagements" associated with the low-margin projects that the Company was transitioning from, Defendant Peterschmidt stated that ***"[the Company] saw most of the problematic scenarios flow to the surface in the fourth quarter***," thus indicating to the market that the worst effects of these low-margin contracts had already been realized.    In fact, when questioned about the Company's financial condition and business outlook in light of the operational transitions and underwhelming margins for the quarter, Peterschmidt steadfastly maintained that he "remain[ed] very confident about the outlook for the company":

**Analyst**

First thing, margins, obviously a little disappointing in the quarter, beyond the project charges, a lot of moving parts but -- particular ***I wanted to focus on just, if you could talk a little bit more about the fixed price project overruns, the problematic legacy engagements, sort of the stuff that I guess is going to be ongoing into 2011***.

- 18 -

How large are we talking here? *What kind of ongoing impact is expected*? When will these things wind down? Just to help investors, I guess, kind of get some confidence that these issues are kind of boxed in and not things that may pop up here and there as unpleasant surprises.

**Dave Peterschmidt** - *CIBER, Inc. - President, CEO*

Yes, George, this is Dave. *I'm pretty confident that we saw most of the problematic scenarios flow to the surface in the fourth quarter*. Obviously, we didn't like the outcome, but I think we took the necessary actions to contain the downside risk in the future. Will we find one or two other things that we don't know about? Possibly. *But, I do believe that we're probably 90% there in containing the types of problems that really battered the margins in the fourth quarter*.

\*   \*   \*

**Analyst**

Okay. Last question, just a high-level question, stepping back, it's been a little over two months since you held the meeting in New York. You had kind of -- obviously a mixed quarter, but a little disappointing on the margin side, which is obvious a key focus for investors, *but you're maintaining your outlook. Has anything over the past couple of months changed in any major way in terms of your confidence and your ability to achieve the guidance and the targets that you've reiterated, excuse me, reiterated more or less confident*? If so, why or why not?

**Dave Peterschmidt** - *CIBER, Inc. - President, CEO*

No, I'm actually -- *I actually remain very confident about the outlook for the company*. As I indicated, we're seeing good business coming in, we've got a top line that's growing. We've got the new bookings that are coming in, are meeting our standards for margin and risk mitigation*. So, I'm very confident about that.

The team has really been embracing the new operational regimens, and I believe that's bringing tremendous cohesion to this management team. So, I don't see a market problem, and I don't see an internal execution problem. *I think we're on solid ground, based on what we told you in December*.

And, we tried to signal, as best we can, that we knew the fourth quarter was going to be a really rugged quarter for us, and that we were going to do a lot of cleanup and that we were going to probably suffer a couple of execution issues just because of the massive realignment that we did with the consolidation of Custom Solutions and ERP and then going to a functional org structure. *So, yes, the fourth quarter hasn't put me off at*

***all. I mean, quite frankly, I don't like the outcome, but I think we did all the right things***.

49.     These statements were materially false and misleading, and lacked a reasonable basis when made, because:

a) The deal review committee had not yet even adequately identified all problematic fixed-price contracts, much less evaluated and addressed potential issues related to those contracts.

b) The Company, in part due to the Company-wide overhaul, lacked the operational discipline, process and controls to adequately identify and address the problematic legacy contracts.

c) The Company faced substantial weakness in sales in its North American sector, which accounted for over a third of the Company's total revenues during the Relevant Period, with no indication that this weakness would not continue.

50.     On February 25, 2011, the Individual Defendants caused the Company to file its Form 10-K for the fourth quarter and 2010 fiscal year ended December 31, 2010, with the SEC.   The Form 10-K reiterated the financial results issued in its earnings release, and was signed by Defendants Peterschmidt, Cheesbrough, Jacobs, Kurtz, Lauk, McGill, Spira, and non-defendant Bobby Stevenson.   Further, the Individual Defendants warranted that they had conducted an evaluation of the effectiveness of "***the design and operation of [CIBER's] disclosure controls and procedures***" and the Company's "***internal control over financial reporting***," and determined that they were "***effective***."   These representations were critical in the context of the Company's transition for two reasons.   First, with managerial and operational overhaul of the entire

Company, CIBER investors clearly wanted assurances that the Company was maintaining effective oversight and disclosure control and procedures.  Second, given the contrast between the aggressive forecasts by Defendants Peterschmidt and Cheesbrough as CIBER moved away from low margin contracts and the markedly more tepid fourth quarter earnings results in part because of low margin legacy contracts, investors wanted assurances that the true impact of these legacy contracts was being reported accurately to the market.  Investors received assurances on both fronts.

51.    In particular, the 10-K stated:

**Item 9A.  Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures -** During the fiscal period covered by this report, our management, with the participation of ***our principal executive officer and principal financial officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures***, as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act.  ***Based upon this evaluation, our principal executive officer and principal financial officer have concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective*** to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (2) accumulated and communicated to our management, including our principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control Over Financial Reporting -** ***Our management is responsible for establishing and maintaining adequate internal control over financial reporting***, as such term is defined in Exchange Act Rule 13a-15(f).  ***CIBER's internal control systems were designed to provide reasonable assurance to the Company's management and Board of Directors regarding the preparation and fair presentation of published financial statements***. All internal control systems, no matter how well designed, have inherent limitations.  Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.  Therefore,

even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Under the supervision and with the participation of our management, including *our principal executive officer and principal financial officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting* as of December 31, 2010, based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission. *Based on our evaluation under the framework in Internal Control - Integrated Framework, our management concluded that our internal control over financial reporting was effective as of December 31, 2010*.

52. These statements were materially false and misleading, and lacked a reasonable basis when made, because:

a) The Company, in part due to the Company-wide overhaul, lacked effective operational discipline, disclosure procedures and internal controls.

b) Implementation of an enhanced IT infrastructure was not even slated to begin until 2011, which meant that a significant risk existed that ongoing problems with untimely or inaccurate financial reporting would continue throughout much of 2011.

53. In response to the statements made on February 22-25, 2011, the price of CIBER's common stock increased 6.6% from a prior-day close of $4.38 to a close of $4.67 per share on February 25, 2011.

54. On May 3, 2011, CIBER issued a press release announcing its financial results for the fiscal 2011 first quarter. The Company reported revenues of $282.5 million (increase of 8% year-over-year), earnings of $4.1 million (increase of 17% year-

over-year), gross margin of 25.8%, and EPS of $0.06 for the quarter.   Defendant

Peterschmidt raved about the Company's "largest year-over-year [revenue] increase in

10 quarters," boasting that "[t]he transformation of CIBER continues to progress," and

the Company's "financial performance this quarter, particularly [its] improved gross

margin, underscores the progress [that CIBER is] making."   Defendant Peterschmidt

assured investors that although the North American division was exhibiting "lagging

sales performance," that the Company was "confident that [it was] taking the necessary

steps to improve the trend in the back half of this year and to deliver on [its] full-year

expectations."   As such, the Company reaffirmed its long-term and 2011 business

outlook.  The press release read as follows, in pertinent parts:

### CIBER REPORTS REVENUE GROWTH OF 8% AND EPS OF $0.06
### International Division Robust Results Continue
### 2011 Outlook Reaffirmed

**GREENWOOD VILLAGE**, **Colo.**, **May 3, 2011**— CIBER, Inc. (NYSE: CBR), a global information technology consulting, services and outsourcing company, today reported results for the first quarter of 2011.

\*   \*   \*

President and Chief Executive Officer Dave Peterschmidt said, "***The transformation of CIBER continues to progress***. Our goal is to improve financial performance utilizing a refined strategic approach, improved operational regimens, and increased as well as narrowed focus on higher margin, well developed offerings. ***Our financial performance this quarter, particularly our improved gross margin, underscores the progress we are making***."

Peterschmidt continued, "The ongoing transformation will have its ups and downs during this transitional year.  Our International division, which delivered another great quarter, has made substantial progress.  The North America division however, has not progressed as quickly.  ***We made specific changes to the North American leadership to address the operational issues and to ensure that we have a plan in place to deliver financial performance at this division in line with our expectations***."

\* \* \*

**Outlook**

Management reaffirmed its long-term outlook and its expectations for 2011.

Long-term outlook:
- Double-digit revenue growth
- Gross profit margin exceeding 30%
- Operating margin exceeding 8%
- Double-digit EPS growth
- Cash flow from operations to approximate net income

***2011 expectations***:
- ***Revenue growth exceeding 4%***
- ***Gross profit margin exceeding 25.5%***
- ***Operating margin exceeding 3.5%***
- ***EPS exceeding $0.30***
- ***Tax rate in the high-twenty to low-thirty range (original expectation was mid thirties)***
- ***Cash flow from operations of approximately $30 million***
- ***Capital expenditures of approximately $20 million, mostly to fund IT infrastructure improvements and the India build-out***

2011 Key Success Factors
- Higher quality deal wins in key verticals
- Improved DSO and cash collection
- Gross and operating margin improvement
- Expanded India delivery
- Enhanced operational execution

"While lagging sales performance within our North America division has impacted financial results into the second quarter, we are confident that ***we are taking the necessary steps to improve the trend in the back half of this year and to deliver on our full-year expectations***," Peterschmidt concluded.

55.    That same day, in an earnings conference call, Defendants Peterschmidt and Pumilia reiterated the Company's financial results and business outlook presented in the press release.   Although admitting that 2011 was a transitional year for the Company, Defendants Peterschmidt and Pumilia vehemently insisted and expressed

supreme confidence that the Company expected to achieve its aggressive 2011 business outlook:

**Claude Pumilia** - *CIBER, Inc. - CFO*

\* \* \*

Moving to our outlook. ***As you read this morning in press release, we are affirming our long-term and 2011 outlook.*** For the long term, at least three years out, our mature model should deliver the following -- double-digit revenue growth, gross profit margin exceeding 30%, operating margin exceeding 8%, double-digit EPS growth, and cash flow operations that approximates net income.

Specific for 2011, we expected some lumpiness this year as we transition the Company. ***We remain confident, however, in our ability to achieve our stated goals, despite the challenges in North America persisting into the second quarter***.

***For the year, we still expect to deliver the following -- revenue growth exceeding 4%; gross profit margin exceeding 25.5%; operating margin exceeding 3.5%; and EPS exceeding $0.30; a tax rate in the high 20 to low 30 range -- this is down from our previous expectation of the mid-30s tax rate and the changes from a reduction in US taxable income this year; cash flow from operations in the $30 million range; and finally, capital expenditures in the $20 million range.*** The increase in 2011 is mostly from CapEx for IT infrastructure improvements and the continued India build-out.

With that, I will turn it back to Dave.

**Dave Peterschmidt** - *CIBER, Inc. - President, CEO*

Okay. Thanks, Claude.

I'm generally pleased with the quarter, obviously, especially in our ability to grow both gross margin and top-line revenue simultaneously, as evidenced by our international group. This has come about through a persistent and continued focus on their part on vertical markets and key practices.

We are clearly bringing this same focus to our North American business. Although the performance of this unit was disappointing, it is a byproduct of the much needed changes we made in Q3 and Q4 of last year. ***I am confident we will get the sales and the delivery resources in place***

- 25 -

***over the next two quarters to bring this unit up to the performance expectations we have for it***.

\* \* \*

**Analyst**

Okay. Just as it relates to the 2011 guidance that was reiterated, just given the North American challenges and what you've seen as you continue to go around and look at the different parts of the business, would you note any change, I guess, in your confidence levels on achieving the guidance that you've set out?

**Dave Peterschmidt** - *CIBER, Inc. - President, CEO*

***No. No, not at all***. In fact, we are very encouraged by international's performance in Q1. And we have some pretty good visibility into that business going forward and we're encouraged by what we see there. And we think, as in any turnaround like this or reorg, we're going to have a couple of soft spots, but the balance that we've got in the business and the strength that we see in international we think is a real positive for us and it's going to help us.

\* \* \*

Brian Kinstlinger – Sidoti & Company – Analyst

Great. Thanks very much. Good afternoon. The first question I wanted to ask was on the contract size, contract losses. In the fourth quarter, obviously, you had a bunch of troubled contracts. Your profitability still improved sequentially, meaning that you probably fixed some of the contracts. Can you quantify the losses on fixed- price contracts, where you're losing money, so we can maybe pull those back and see the progress you're really making?

Dave Peterschmidt – CIBER, Inc. – President, CEO

We really – Brian, we really haven't put that data together in an aggregate form, and ***I don't know that we've got it in any form of accuracy right now*** that I think would be useful to you. I think it's something we'll look at. And Claude's taking a note on this and we'll see if we can put something together for future calls on that. It's not a bad question and it's a good data point for us to look at, but we don't have it at our fingertips today.

\* \* \*

- 26 -

Vincent Coluccio – Noble Financial Group – Analyst

Most of my questions were answered, just a couple here. Dave, are you feeling – ***I assume you're feeling more confident that the problem contracts are under control than you did last quarter. If that's correct, perhaps you can give us some color***.

Dave Peterschmidt – CIBER, Inc. – President, CEO

Yes. I feel that we've really started to get our arms around it. And I will also tell you that, again, Tim Montgomery coming onboard – and he has brought a couple of new people with him and they have really gotten into these things quickly and they're showing us that they can resolve these pretty rapidly. ***So, I'm much more optimistic that we've got that type of contract under control now.***

I still think there – we may have one or two that we're not going to do everything that we had hoped to get accomplished in there but, hopefully, we've already provided for that and what we did in the fourth quarter in our reserves. But, I'm feeling substantively much better that we now have management on the ground that is getting their arms around these scenarios.

56.    These statements were materially false and misleading when made and lacked a reasonable basis when made, because:

a)  The Company faced substantial weakness in sales in its North American sector, which accounted for over a third of the Company's total revenues during the Relevant Period, with no indication that this weakness would not continue.

b)  The deal review committee had not yet adequately evaluated all problematic fixed-price contracts in order to address potential issues related to those contracts.

c)  The Company, in part due to the Company-wide overhaul, lacked the operational discipline, process and controls to adequately identify and address the problematic legacy contracts.

57.     The same day, the Company to filed its Form 10-Q for the first quarter of the 2011 fiscal year ended March 31, 2011, with the SEC.  The Form 10-Q reiterated the financial results issued in its earnings release.  Further, the Individual Defendants claimed that they had conducted an evaluation of the effectiveness of  "the design and operation of [CIBER's] disclosure controls and procedures," and determined that they were "effective":

### Item 4.  Controls and Procedures

**Evaluation of Disclosure Controls and Procedures —** During the fiscal period covered by this report, our management, with the participation of ***our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures***, as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act. ***Based upon this evaluation, our principal executive officer and principal financial officer have concluded that, as of the end of the period covered by this report, our disclosure controls and procedures were effective*** to ensure that information required to be disclosed by us in reports we file or submit under the Exchange Act is (1) recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and (2) accumulated and communicated to our management, including our principal executive officer and principal financial officer, to allow timely decisions regarding required disclosure.

58.     This statement was materially false and misleading when made and lacked a reasonable basis when made, because:

a)  The Company, in part due to the Company-wide overhaul, lacked effective operational discipline, disclosure procedures and internal controls.

b)  Implementation of an enhanced IT infrastructure was not even slated to begin until 2011, which meant that a significant risk existed that ongoing problems with untimely or inaccurate financial reporting would continue throughout much of 2011.

59.     In response to these May 3, 2011 statements, the price of CIBER's common stock increased 10.4% from a prior-day close of $5.69 to a close of $6.28 per share on May 3, 2011.

**Each Individual Defendant Knew or Recklessly Disregarded the Material Falsity of these Statements**

60.     Each Individual Defendant had contemporaneous and direct access to specific, material facts that contradicted and demonstrated the misleading nature of the above challenged statements.  As a result of this access, each Individual Defendants knew or recklessly disregarded the material falsity of these statements.

**Officer Defendants**

61.     Officer Defendants Peterschmidt, Cheesebrough, and Pumilia each gained intimate, contemporaneous knowledge of facts that directly contradicted the very statements they made regarding the transformation.  Indeed, the Officer Defendants repeatedly assured investors on numerous occasions that they had intimate knowledge of the details of all the Company's significant contracts, including fixed-price arrangements, as well as being directly involved in the effort to root out and remediate problematic contracts that had caused "profit leaks" in the past.

62.     For instance, on December 15, 2010, Peterschmidt stated, "Any deal now that is $1 million or more cannot be presented to the customer until is has passed the deal review committee.  The deal review committee is made up of *myself, the operating division chiefs, [Cheesebrough], legal, [and] HR*.  It is every aspect of the company."  Further, an April 2011 presentation to shareholders confirmed that the Officer Defendants had direct, regular access to this information: "[W]e've established a deal review committee to scrutinize, *on a weekly basis*, significant deals to make sure

they pass muster in terms of our strategic focus . . . [the committee is] an example of how we've ***centralized decision-making***, and unified the company's pursuit of performance benchmarks."

63.     These express statements that each Officer Defendant had real-time knowledge of all aspects of the transformation, coupled with each Officer Defendant's weekly participation in the Deal Review Committee and quarterly participation in the Quarterly Business Review meetings (wherein all aspects of the transition were discussed), confirm that these defendants had actual, contemporaneous knowledge of the falsity of their optimistic statements concerning the transformation.

### Director Defendants

64.     Each Director Defendant also gained contemporaneous access to facts that directly contradicted the very statements about the transformation that they approved, authorized, or failed to correct.

### Defendant Kurtz

65.     Defendant Kurtz regularly met with and/or received reports from senior executive management – including the Officer Defendants – throughout 2010 and 2011, in the exercise of his oversight duties with the Transition Committee.   In order to conduct oversight of the transition at the executive level, Kurtz received updates about the progress and timing of the fulfillment of the transformation's four key initiatives.   In particular, and on information and belief, Defendant Kurtz regularly summary updates from the Officer Defendants and/or directly communicated with them regarding:

a) Progress on creating a tighter focus on specific high-margin markets, including addressing existing low margin fixed-price legacy contracts and implementing stricter guidelines for new vendor contracts;

b) Progress on hiring and training of new employees in furtherance of the goal to "develop a world-class sales force";

c) Progress on implementing an enhanced and improved IT infrastructure to ensure timely and accurate operational and financial reporting; and

d) Progress on instilling new operating regimens at CIBER.

66.    As a part of this review, Defendant Kurtz monitored the progress of the deal review committee, including its identification of existing low-margin contracts and review of new contracts under the revised strategic initiative.  Kurtz also periodically received updates on particular aspects of the transformation discussed at Quarterly Business Review meetings, including the status of CIBER's IT infrastructure overhaul and operational regimen changes.

67.    As a result of this review, Defendant Kurtz learned the following specific facts regarding the progress and timing of the transformation:

a) The deal review committee had completed its implementation of a stricter set of guidelines through which to review future contracts by the end of 2010;

b) However, the deal review committee's review of existing problematic contracts was not completed by the end of 2010 and would continue well into 2011.  As a result, the deal review committee could not

reasonably guarantee that significant problematic contracts would not arise in 2011;

c) Implementation of an enhanced IT infrastructure was not even slated to begin until 2011, which meant that a significant risk existed that ongoing problems with untimely or inaccurate financial reporting would continue throughout much of 2011; and

d) Implementation of new operating regimens designed to increase operational efficiency and reporting accuracy would continue throughout much or all of 2011.

68.    Defendant Kurtz's knowledge is evidenced by specific public statements approved by Kurtz in early 2011 that confirm these materially adverse, non-public facts.

69.    For example, with respect to the deal review committee's progress, Kurtz confirmed that the committee's ongoing review of existing contracts in statements he approved in CIBER's 2010 Form 10-K, dated February 22, 2011 ("2010 Form 10-K"):

"We are [currently] rigor "We are rigorously analyzing existing . . . customers to assess their long-term financial and strategic importance for CIBER.  Our goal is to identify those customer engagements that are likely to yield increased financial returns for us . . ."

"In connection with our extensive strategic review completed in 2010, we have tightened our standards governing the quality of engagements that we will accept [in the future] with the goal of growing revenue, [and] increasing margins . . ."  However, with respect to existing fixed-price contracts, cost overruns and "project cancellations cannot be accurately predicted and bad debt expense will differ from our estimates . . ."

70.    With respect to this ongoing contract review, other statements approved by Kurtz in the 2010 Form 10-K demonstrate that no reasonable basis existed to provide FY 2011 guidance so long as there remained the possibility that problematic legacy contracts would later be discovered.  First, the 2010 Form 10-K explained that

cost overruns on fixed-price contracts adversely affected U.S. ERP, one of the two divisions consolidated by the transformation:

> "U.S. ERP operating income decreased primarily due to situations involving two specific problem clients. . . . ***Overruns on some fixed-price projects and increased usage of higher-priced subcontractors also contributed to the lower 2010 operating income***.

> "[D]uring the fourth quarter of 2010, we incurred higher than usual bad debt expenses, and we ***reversed a large amount of project revenue previously recognized under the percentage-of-completion method due to revised estimates of project completion***."

71.     Then, statements approved by Kurtz in the 2010 Form 10-K indicate that such a situation could recur in 2011 and beyond, appearing to confirm that the deal review committee had not yet (as of February 22, 2011) adequately identified and addressed all problematic fixed-price contracts:

> "We may experience declines in revenue and profitability if we do not accurately estimate the cost of a large engagement conducted on a fixed-price basis."

> "Our five largest clients accounted for approximately 22% of our total revenue in 2010."

> "Under fixed-price contracts, which currently make up approximately 20-25% of our services revenue, our revenue is fixed under the contract, while our costs to complete our obligations under the contract are variable."   "[W]ith fixed-price contracts, it may result in higher costs and lower gross profit margins because our revenue is fixed."

> "Our typical time-and-materials hourly rates . . . are generally highest in our U.S. ERP division . . ."

72.     With respect to the overhaul of CIBER's IT infrastructure, Kurtz approved statements in the 2010 Form 10-K confirming that the overhaul would continue well into 2011.  These statements also confirmed that such a delay created risks that financial data would be untimely or inaccurately reported, and that any financial forecasting (including the FY 2011 guidance) would be inherently unreliable.  For example, the

2010 Form 10-K confirmed that one of CIBER's "key initiatives [was] . . . developing world-class management *information systems to provide us with crucial project-specific financial information* . . ." However, the 2010 Form 10-K also confirmed that development of these enhanced IT systems was "ongoing" and that a critical part of the initiative had not yet even begun: "As part of our new strategic plan, we plan to recruit a Chief Information Officer and *enhance our information management systems to enhance forecasting capabilities* . . ."

73.    Finally, with respect to CIBER's operational regimen overhaul, Kurtz approved public statements confirming that this overhaul would continue throughout 2011, and that it carried the potential to be significantly disruptive: "To improve our delivery execution . . . and cash collection cycle, *we are changing our internal operational regimes*.   As with any organization with over 8,600 employees and contractors, *effecting significant changes in operational regimes and corporate culture can be challenging*."

74.    Given the ongoing overhaul of CIBER's IT infrastructure and operational systems, as well as the attendant significant risks that this ongoing overhaul could continue to compromise the accuracy of CIBER's financial disclosures, Kurtz thus knew or recklessly disregarded that the Company's internal controls were not adequate.

75.    Defendant Kurtz's knowledge of these facts – and, as a result, his knowledge or reckless disregard that no reasonable basis existed to offer FY 2011 guidance – also is evidenced by his service on CIBER's Audit Committee in 2010 and 2011.   While the Company's Audit Committee Charter sets forth general oversight duties for members of CIBER's Audit Committee (as summarized below), Defendant

Kurtz himself explicitly described the actions he took in 2010 and 2011 to fulfill these oversight duties.  For example, Defendant Kurtz prepared, approved, and signed the 2010 "Report of the Audit Committee" published in CIBER's 2011 Form 14A Proxy Statement, dated April 12, 2011, as well as the 2011 "Report of the Audit Committee" published in CIBER's 2012 Form 14A Proxy Statement, dated April 5, 2012.  Each report explained generally that "the Audit Committee of the Board assists the Board in fulfilling its responsibilities for financial reporting compliance by reviewing the audited financial statements, reviewing the system of internal controls that management and the Board of Directors have established and reviewing the overall audit process."  Then the reports listed the specific oversight actions taken by Defendant Kurtz in 2010 and 2011:

- ***reviewed and discussed the 2010 audited financial statements*** separately and jointly with management and with Ernst & Young LLP ("E&Y"), our independent registered public accounting firm;

- ***provided oversight and advice to management with respect to the documentation, testing and evaluation of our system of internal control over financial reporting*** pursuant to Section 404 of the Sarbanes-Oxley Act of 2002 and related regulations, received periodic updates provided by management and E&Y and reviewed a report on the effectiveness of our internal control over financial reporting;

- discussed with E&Y the matters required by the Statement on Auditing Standards No. 114, "Codification of Statements on Auditing Standards," AU§380, as modified or supplemented by the Auditing Standards Board of the

American Institute of Certified Public Accountants or the Public Company Accounting Oversight Board (PCAOB);

- received the written disclosures and the letter from E&Y required by applicable requirements of the PCAOB for independent auditor communications with the Audit Committee, as the same may be modified or supplemented, and has discussed with E&Y its independence; and

- considered whether the auditor's provision of non-audit services is compatible with independence and concluded that the services rendered by E&Y are compatible with maintaining the principal accountant's independence, no fees were billed for services other than audit, audit-related or tax services.

76.     The 2010 audited financial statements which Kurtz admitted to reviewing were contained within the 2010 Form 10-K, and confirm Kurtz's knowledge that any remaining unknown or unaddressed fixed-price legacy contract could have a significantly negative impact on CIBER's financial health.   The notes to these statements explain that "revenue for technology integration consulting services . . . is generally recognized based on the percentage-of-completion method.   Under the percentage-of-completion method, management **estimates the percentage of completion based upon the contract costs incurred to date as a percentage of the total estimated contract costs**.  **If the total cost estimate exceeds revenue, we accrue for the estimated loss immediately.**"

77.     This form of revenue recognition creates significant risks for CIBER with respect to fixed-price contracts, as explained in the notes to the audited financial statements: costs are generally "expensed as incurred" on a contract, but "[f]or fixed-

price contracts . . . revenue may be recognized . . . when final deliverables have been provided." In other words, CIBER has to expense its costs on a given fixed-price contract as those costs arise throughout the lifetime of the contract, but *may not be able to recognize any revenue until the contract has been fully and finally performed*. Kurtz's knowledge of this risk, combined with his knowledge that the deal review committee continued to review potentially problematic fixed-price contracts well into 2011, confirms that no reasonable basis existed to provide FY 2011 guidance.

### Defendant McGill

78.     Defendant McGill joined the newly-created Search Committee shortly after the announcement of former CIBER CEO Slingerlend's departure from the Company in April 2010. The Board initially created the Search Committee to aid the Company in finding a qualified CEO to address CIBER's declining financial health, and the Search Committee's role expanded throughout 2010 and 2011 to find qualified executives who could beneficially aid Defendant Peterschmidt's planned Company-wide transformation. In his role on the Search Committee, Defendant McGill assisted in the review and hiring of a new CEO (Peterschmidt, effective July 1, 2010), a new CFO (Pumilia, effective April 1, 2011 following the sudden resignation of Cheesebrough from that position), and a new Chief Information Officer to "enhance [CIBER's] information management systems to enhance forecasting capabilities . . ."

79.     During his efforts to find a new CEO between April and July 2010, Defendant McGill reviewed the overall health of the Company to try and ascertain the primary reasons for CIBER's revenue shortfalls. As evidenced by the July 1, 2010 press release announcing Peterschmidt's hire, McGill learned that CIBER's financial

health was being negatively affected by inadequate "operational discipline" and a lack of "streamlined operations."

80.     During his efforts to find a new CFO in early 2011 following the departure of Cheesebrough, Defendant McGill was required to assess both from Cheesebrough and from internal Company data what potential financial problems existed at CIBER that would need to be addressed by any new CFO.  Such a review would have been necessary to guide the identification of candidates best equipped to quickly and efficiently address these issues with as little disruption as possible while CIBER continued its "transition year."

81.     Thus, on information and belief, Defendant McGill gained direct access to CIBER's internal financial reports, financial risk data, internal financial disclosure controls data, and internal audit reports with respect to the Company's financial risk and reporting controls.  As a result of this review, McGill learned that: 1) CIBER's existing and future financial health remained uncertain because the deal review committee had yet to complete its evaluation of all fixed-price legacy contracts, and 2) CIBER's problematic internal financial reporting controls continued to face significant risks from the ongoing operational and IT infrastructure overhauls designed to correct these problems but which were still being implemented.

82.     In addition, during his efforts to find a qualified Chief Information Officer (which, according to the 2010 Form 10-K, had not yet begun as of February 22, 2011) Defendant McGill learned that the overhaul of the Company's IT infrastructure, which had already been acknowledged as a major reason for the Company's troubled internal financial disclosure controls, remained in its relative infancy as of early 2011.

83.     McGill's knowledge of these facts is evidenced by his public approval of statements at ¶¶68-73 above which confirm these facts and directly contradict other statements made by the Officer Defendants.

84.     Further, McGill's knowledge of facts concerning CIBER's financial health and reporting controls deficiencies throughout 2010 and early 2011 confirms his knowledge or reckless disregard that no reasonable basis existed to offer FY 2011 guidance.  His knowledge or reckless disregard of the materially misleading nature of this FY 2011 guidance is evidenced and confirmed by: a) his express acknowledgement in the Company's 2010 and 2011 Reports of the Audit Committee that he reviewed and discussed the contents of CIBER's 2010 audited financial statements; and b) statements contained within these audited financial statements (see above at ¶¶75-77) confirming the unreasonableness of offering FY 2011 guidance while the deal review committee continued its weekly review of problematic legacy contracts.

## Defendant Jacobs

85.     By the Company's own admission, Defendant Jacobs was responsible for "guid[ing] the Board through the management transition."  Therefore, by the Company's own admission, Defendant Jacobs alone was charged with ensuring that the Company-wide transformation was proceeding smoothly from a Board-level perspective.

86.     As the liaison between management and the Board during the transition, his responsibility necessarily required Jacobs to meet regularly with senior management, including the Officer Defendants, to discuss the progress of the transition and ascertain specific facts about the review of existing and future contracts, the status

of the IT infrastructure overhaul, and the implementation of revised operational regimens.  As a result of these consultations throughout 2010 and 2011, Jacobs gained access to and knowledge of the inner workings of the Company's transition, and as a result, of the significant problems facing the Company throughout 2011.   Jacobs' knowledge of these facts is confirmed by his approval of public statements (discussed above at ¶¶68-73) in the 2010 Form 10-K discussing the existence of these very facts.

87.   In addition, Jacobs' unique responsibility to guide the Board and management through the transition required him to regularly consult with the Director Defendant members of the Search Committee and Transition Committee.   These consultations were necessary to ensure both that these Board-level committees were functioning adequately and receiving adequate support from management, and to gain knowledge of the progress and timing of the transformation from a Board-level perspective.  As a result of these consultations, Jacobs gained direct knowledge of the specific facts concerning the transformation as discussed at ¶¶65-67, 78-82.

### Defendant Spira

88.   Defendant Spira regularly met with and/or received reports from senior executive management – including the Officer Defendants – throughout 2010 and 2011, in the exercise of his oversight duties with the Transition Committee.   In order to conduct oversight of the transition at the executive level, Spira received updates about the progress and timing of the fulfillment of the transformation's four key initiatives.  As a result of this review, Spira learned about the contemporaneous, non-public, adverse facts contradicting the Officer Defendants' public statements about the transformation discussed at ¶¶65-67.

89.     Defendant Spira's knowledge of these facts is evidenced by specific public statements approved by Spira in early 2011 that confirm these materially adverse, non-public facts.  These facts are summarized at ¶¶68-73.

### Defendant Lauk

90.     Defendant Lauk joined CIBER's Board in November 2010, just before the Officer Defendants began making materially misleading statements about the Company's transformation.   Despite being a relative newcomer, Lauk publicly acknowledged that he took specific review and oversight actions in late 2010 and early 2011 to confirm his access to and knowledge/reckless disregard of specific facts confirming the falsity of the Officer Defendants' statements.

91.     For example, Lauk specifically acknowledged in the 2010 Report of the Audit Committee that he "reviewed and discussed [CIBER's] 2010 audited financial statements."  Having reviewed the Company's 2010 audited financial statements, Lauk was therefore aware of the significant risks facing CIBER throughout 2011 with respect to potentially unidentified low-margin legacy contracts as evidenced by the statements discussed above at ¶¶65-67.  Further, Lauk acknowledged that he "provided oversight and advice to management with respect to . . . [CIBER's] system of internal control over financial reporting" in 2010.  Such oversight and advice would have made Lauk aware of ongoing risks facing CIBER's internal controls systems throughout 2011, including the ongoing operational and IT infrastructure overhauls designed to correct these problems but which were still being implemented throughout 2011.

92.     Lauk also specifically approved public statements in CIBER's 2010 Form 10-K, discussed at ¶¶68-73, which confirm the existence of these adverse facts, as well as Lauk's knowledge of these facts.

**The Individual Defendants Were Motivated to Artificially Inflate Revenues and CIBER's Stock Price**

93.     The Individual Defendants were motivated by the terms of their employment agreements, which tied their compensation directly to CIBER's reported earnings.  Notably, for 2011, the Company changed the way the Individual Defendants would be awarded cash incentive awards.  For 2010 and periods prior, such awards were awarded on an annual basis.  For 2011, however, the Compensation Committee adopted a scheme in which such awards would be determined and awarded "after the end of each quarter based on total Company or business unit performance."  Thus, the Individual Defendants were clearly motivated to conceal known revenue recognition problems for as long as possible in 2011, even if they knew that the truth would likely be revealed before the end of the year.

94.     In addition, on May 18, 2011, the Company filed a form 8-K with the SEC reporting the amended and restated CIBER 2004 Incentive Plan (the "Incentive Plan").  The members of the Board, including Defendants Peterschmidt, Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson, had approved the amendments, including the issuance of 4,750,000 additional shares, bringing the total number of authorized shares to 14,750,000.  The Incentive Plan provides for awards of up to 1 million shares to each individual per year, with awards to be determined by the Board and the Compensation Committee.

95.     The Incentive Plan's stated purposes are to:

provide the officers, employees, consultants, and directors of the Company selected for participation in the [Plan] with added incentives to continue in the long-term service of the Company and to create in such persons a more direct interest in the future success of the operations of the Company by relating incentive compensation to increases in stockholder value, so that the income of such persons is more closely aligned with the income of the Company's stockholders. The [Plan] is also designed to enhance the ability of the Company to attract, retain and motivate officers, employees, consultants, and directors by providing an opportunity for investment in the Company.

96.     However, the Incentive Plan provides no meaningful limitations on the amount of stock awards to be granted, and allows the Individual Defendants to grant the awards to themselves with no meaningful guidelines.  The stated purposes of the Incentive Plan, approved by Defendants Peterschmidt, Jacobs, Kurtz, Lauk, McGill, Spira, and Stevenson, are false and misleading because the actual purpose is to allow the Individual Defendants to distribute the Company's assets to themselves, to the detriment of the Company.

## THE TRUTH IS REVEALED

97.     On August 3, 2011, CIBER issued a press release announcing its financial results for the fiscal 2011 second quarter.  The results were disappointing, to say the least, as the Company reported revenues and earnings that were well-below expectations.  In particular, the Company reported revenue of $267.8 million, a mere 1% increase in revenue year-over-year, and a net loss of $58.4 million, far below the aggressive forecasts made by the Individual Defendants during the Relevant Period. These dismal figures were attributed, in part, to a $13.4 million charge as a result of "adjustment for significant changes in estimates related to costs or scope on the five fixed-price projects."  These five "fixed-price projects" were precisely the types of low margin legacy contracts whose adverse financial effect:

d) As Defendant Cheesbrough claimed on December 15, 2010, the Company had already mitigated (the Company "*ha[s] already walked through a number of actions which include runoff of existing lower margin business*"); and

e) As Defendant Peterschmidt claimed on February 22, 2011, the Company had already absorbed (in response to an analyst question about fixed price overrun, "*we're probably 90% there in containing the types of problems that really battered the margins in the fourth quarter*.").

98.    In addition, despite the fact that the Individual Defendants minimized the seriousness of the North American division's underperformance during the Relevant Period, the underwhelming North American division contributed greatly to the Company's sub-par quarterly performance reporting a 23% decline in revenue. Defendant Peterschmidt blamed the Company's poor showing on "issues in [CIBER's] North American business … [and] five fixed-price contracts signed in 2009 or earlier in the United States that no longer carry the same level of profitability and thus diminished earnings in the quarter."  As such, the Company suspended its guidance for 2011.  The press release read as follows, in pertinent parts:

**GREENWOOD VILLAGE**, **Colo.**, **Aug. 3, 2011**— CIBER, Inc. (NYSE: CBR), a global information technology consulting, services and outsourcing company, today reported results for the second quarter of 2011.

**Highlights for the second quarter 2011 (results include several significant items described below):**

- Revenue increased 1% to $267.8 million

- Operating loss of $26.5 million, or operating income of $5.2 million excluding significant items

- Net loss of $58.4 million, or net loss of $0.1 million excluding significant items

- EPS of $(0.81), or EPS of $0.00 per share excluding significant items

- Cash on hand at quarter end of $62 million

President and Chief Executive Officer Dave Peterschmidt said, "Our International business continued to perform extremely well with double-digit revenue growth and margin expansion in the second quarter. This success is a function of our focused strategy and I remain confident that we can replicate this in North America as we continue to narrow our focus and increase our discipline."

Peterschmidt continued, "***Our overall performance, however, was adversely affected by issues in our North American business and on the balance sheet***. Specifically, as a result of a more disciplined approach to managing CIBER, *we identified five fixed-price contracts signed in 2009 or earlier in the United States that no longer carry the same level of profitability and thus diminished earnings in the quarter*. The charges related to these contracts and other items reflect the fact that we are implementing the rigorous processes we need to make CIBER a truly world-class, professionally managed services company."

*The Company noted that as a result of the reduction in earnings related to the five fixed-price contracts, a revenue decline in North America and the write-off of historic balance sheet items; it is withdrawing its financial guidance for full-year 2011*.

Claude Pumilia, Executive Vice President and Chief Financial Officer, commented, "***We have suspended guidance for 2011 because our North America business does not yet have the operational rigor required to drive predictable results***. We do believe, however, that we have the downside risk from the five projects understood and contained. We are making progress during this transitional year, namely winning higher-value engagements, increasing the quality of our delivery, and reducing our risk profile by adhering to more stringent processes. I am confident that we will drive improved financial performance across the business."

\* \* \*

*The North American division saw revenue decline 23%, or 13% when adjusted for the five fixed-price projects*. Revenue continues to be

impacted by the open sales positions that existed coming into this year as well as the time it takes for new sales hires to become fully effective. ***Gross profit and gross margin were down compared to last year's second quarter as a result of the significant changes in estimates or scope of the five projects as well as investments made to develop higher-value offerings***.

\*   \*   \*

### Significant Charges

In the second quarter 2011, the Company incurred five significant charges which totaled $58.1 million after-tax ($31.7 million pre-tax) or $0.81 per share.

The items were:

- ***$13.4 million (after-tax and pre-tax) reduction of revenue, gross profit, operating income and net income and a $0.19 per share reduction of earnings per share for an adjustment required under the percentage-of-completion accounting rules as a result in changes in estimates or scope on five fixed-price projects***.

99.    That same day, in an earnings conference call, Defendants Peterschmidt and Pumilia struggled to explain the Company's suddenly meek business prospects that were touted since the Company's fourth quarter fiscal 2010 earnings disclosures. Peterschmidt acknowledged that the "reported results … were significantly below [the Company's] expectations."  Unable to reconcile its positive prior-period statements and business outlook with the Company's dismal figures, Peterschmidt attempted to portray the "variables" underlying the sub-standard financial results, namely - the "sales weakness in North America, [and the] changes in estimates on five projects that were signed in 2009 or earlier," as a "perfect storm that has taken [CIBER] off course in meeting full-year 2011 guidance."  However, as detailed above, the Individual Defendants knew that this "perfect storm" was approaching, or at the very least knew

that they had no basis to make public statements touting the Company's financial condition and business prospects:

**David Peterschmidt** – *CIBER, Inc - CEO*

Thank you, Gary. Good morning, everyone. ***As you have seen, CIBER today reported results that were significantly below our expectations.*** Although the results were not acceptable to us, we can clearly see that the fundamentals are changing, which in turn will lead to improve financial performance. In summarizing the quarter, we drove a strong revenue and profit performance by our largest division, International. ***Offsetting this was sales weakness in North America, changes in estimates on five projects that were signed in 2009 or earlier, and required adjustments to the balance sheet. It is unfortunate that these variables and the resulting charges against earnings came together in one quarter, and created a perfect storm that has taken us off course in meeting full-year 2011 guidance.***

100.    Importantly, Defendant Peterschmidt not only explained that the significant underperformance of the Company was related to a decline in North American sales and charges against legacy contracts, but he also admitted that at least he (and likely other Individual Defendants) actually knew about these problems – and knew that the Company's organizational "transformation" was exacerbating them – in advance but failed to disclose them:

The other significant impact on Q2 was the shortfall in North American sales and revenue production. ***Although it is disappointing, it is not completely unforeseen, given the tremendous reorganization this unit has undergone, as it moves from a branch model to a functional model.*** Additionally, it has rebuilt its sales force from a semi-commodity model sales force to a true enterprise sales force. We are clearly in the middle of a full turnaround of this Company. This involves our cultural shift towards becoming a professionally-managed and operated Company. We have built momentum by making significant improvements to the processes and the depth of our people. As a result, we see the fundamentals in our business gaining strength daily, and know these will result in improved financial performance.

101.    After the above revelations seeped into the market, the Company's stock price plummeted to $3.94 per share on August 3, 2011, a decline of 23.64% from a

previous day closing price of $5.16 per share, on high volume trading.   The decline continued and by August 29, 2011, the stock price had fallen to only $2.91 per share, a decline of almost 58% from the high on April 6, 2011.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

102.    By reason of their positions as officers, directors, and/or fiduciaries of CIBER and because of their ability to control the business and corporate affairs of CIBER, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage CIBER in a fair, just, honest, and equitable manner.   The Individual Defendants were and are required to act in furtherance of the best interests of CIBER and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

103.    Each director and officer of the Company owes to CIBER and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.   In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### Audit Committee Duties

104.   In addition to these duties, the members of the Audit Committee owed specific duties to CIBER under the Audit Committee's Charter to review and approve quarterly and annual financial statements, earnings press releases, and to ensure that the Company had appropriate and effective internal controls over financial reporting.  In particular, the Audit Committee's Charter provided as follows:

The Committee's duties, responsibilities and authority include:

f)  Engaging, approving the compensation of, removing (if circumstances warrant) and overseeing the work of the independent auditor including the negotiation and execution of the engagement letter. Reviewing the audit plan including scope, staffing, locations, reliance upon management and general audit approach. The outside auditor shall report directly to the audit committee.

g)  Annually reviewing the independence and performance of the auditors and the qualifications of the key audit partner and audit managers including a review of the accounting firm's quality control procedures, material issues from the accounting firm's most recent quality control review and the steps taken by the accounting firm to address any quality control issues.

h)  Establishing a policy on provision of non-audit services.

i)  Pre-approving all audit and permitted non-audit services provided to the Company in compliance with law and SEC rules and delegating, at the Committee's discretion, responsibility for decisions regarding pre-approval of non-audit services to one or more Committee members.

j)  Determining and instituting a procedure for (1) receiving and treating complaints received by the Company regarding accounting, internal audit controls and auditing matters and (2) receiving confidential, anonymous reports from employees of the Company regarding questionable accounting or auditing matters.

k)  Receiving reports from and reviewing with the accounting firm (1) all critical accounting policies and practices used in connection with the Company's periodic reports; (2) all alternative treatments of financial information that have been discussed with management, the ramifications of those alternative treatments and the treatments preferred by the accounting firm; and (3) any management letter, schedule of unadjusted differences or other material written communications between the firm and management including any disagreements with management.

l)  Reviewing the Company's annual audited financial statements and periodic reports that include financial statements prior to filing or

distribution and reviewing the Company's specific disclosures under "Management's Discussion and Analysis of Financial Conditions & Results of Operations. The reviews should include a quarterly meeting with each of management, internal audit personnel and the independent auditors to discuss significant issues regarding accounting principles, practices, and judgments and reviewing all significant correcting adjustments (whether or not made) to ensure all material adjustments are properly reflected in the Company's financial reports.

m) Discussing, generally, all financial press releases, other financial information and earnings guidance provided to analysts and rating agencies including discussions of pro forma information to verify that the pro forma information includes reconciliation to comparable GAAP information and does not give undue prominence to the pro forma information or otherwise provide misleading presentations of results of operations or financial condition.

n) Reviewing the processes and procedures by which the Company conducts the due diligence necessary to support the certification requirements of Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

o) Reviewing the audit plans, performance and reports of the internal audit function.

p) Engaging, from time to time as they may deem necessary and without further Board approval, legal, accounting and other advisors.

q) Reviewing, at least annually, the performance of the Audit Committee and reviewing and amending (as necessary) the Committee's Charter, submitting the Charter to the Board of Directors for approval and authorizing the Charter to be published on the Company's website and disclosed in the Company's proxy statement as required by SEC and NYSE rules.

r) In consultation with management, the independent auditors, and the internal auditors, reviewing and discussing significant financial risk exposures and the steps management has taken to monitor, control, and report such exposures.

s) Providing an annual report to shareholders as required by the SEC to be included in the Company's annual proxy statement and Form 10K stating whether the Committee has complied with its responsibilities under the Charter.

t) Advising the Board with respect to the Company's policies and procedures regarding compliance with applicable laws and regulations and with the Code of Business Conduct and Ethics, particularly as it relates to the Company's senior financial officers.

u) Reviewing with the Company's General Counsel legal matters that may have a material impact on the financial statements, the

       Company's compliance policies and any material report or inquiries received from regulators or government agencies.

v) Establishing a clear policy for hiring of former employees of the outside auditor.

w) Reviewing any financial transactions in which the Company and a related party, as defined in the Company's Related Party Transaction Policy and Regulation SK, has a direct or indirect interest.

x) Performing any other activities consistent with this Charter, the Company's bylaws, and governing law, as the Committee or the Board deems necessary or appropriate.

y) Maintaining minutes of meetings and periodically reporting to the Board of Directors on significant results of the foregoing activities.

**Compensation Committee Duties**

105.   In addition to these duties, the members of the Compensation Committee owed specific duties to CIBER under the Compensation Committee's Charter to evaluate and approve the compensation of the Company's executive officers and to monitor the Company's overall compensation policies and practices.  In particular, the Compensation Committee's Charter provided as follows:

The Committee's duties, responsibilities and authority include:

- Reviewing and determining the Company's philosophy, policies and procedures regarding executive compensation and approving corporate goals and objectives as they relate to the compensation of the CEO and the other Executive Officers;

- Evaluating the performance of the CEO and the other Executive Officers based on those corporate goals and objectives;

- Reviewing and determining the CEO and other Executive Officers' compensation based on the performance evaluation and determining that such compensation is reasonable and competitive;

- Reviewing and approving periodically and as and when appropriate, the CEO and the other Executive Officers' compensation, including the following: (a) all incentive awards and opportunities, including both cash-based and equity-based awards and opportunities; (b) any employment agreements and severance arrangements; (c) any change-in-control agreements and change-in-control provisions affecting any elements of compensation and benefits; and (d) any special or supplemental compensation and benefits for the CEO and the other Executive Officers;

- Reviewing and approving, periodically and as and when appropriate, the cash and equity compensation and benefits, if any, provided to the Company's nonemployee directors;

- Determining stock ownership guidelines for the non-employee directors, CEO and other Executive Officers and monitor compliance with such guidelines:

- Overseeing all matters relating to compensation risk assessment;

- Receiving periodic reports on the Company's compensation programs as they affect all employees generally;

- Providing recommendations to the Board on compensation related proposals to be considered at the Company's annual meeting of stockholders, including the approval of executive compensation ("say-on-pay" votes), and the frequency of such votes ("say-when-on-pay"), and reviewing the results of stockholder votes on such proposals and considering implications;

- Reviewing and discussing with the CEO and reporting to the Board plans for Executive Officer development and corporate succession plans for the CEO and Executive Officers;

- Selecting and retaining, in its sole discretion and at its sole authority, any compensation consultant to assist in the evaluation of director, CEO and other Executive Officer compensation and determining the extent of such consultant's engagement;

- Reviewing and discussing with management the Company's Compensation Discussion and Analysis ("CD&A") required to be included in the Company's proxy statement and annual report on Form 10-K by the rules and regulations of the Securities and Exchange Commission;

- Producing the annual Compensation Committee report for inclusion in the Company's proxy statement in compliance with the rules and regulations of the Securities and Exchange Commission;

- Reporting to the Board the Committee's decision regarding CEO and other Executive Officer compensation including cash-based and equity-based compensation plans;

- Administering and making grants under the CIBER, Inc. 2004 Incentive Plan;

- Recommending to the Board, and for stockholder approval where required, changes in or the adoption of equity compensation plans, specifically employee equity plans; and

- Reviewing, at least annually, the performance of the Committee and reviewing and amending (as necessary) the Committee's Charter, submitting to the Board this Charter and any amendments for the Board's review and approval and providing for the posting of the Charter to the Company's website as required by SEC rules and NYSE requirements.

**Control, Access, and Authority**

106.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of CIBER, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by CIBER.

107.    Because of their advisory, executive, managerial, and directorial positions with CIBER, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of CIBER.

108.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of CIBER, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

109.    To discharge their duties, the officers and directors of CIBER were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of CIBER were required to, among other things:

(a)    refrain from acting upon material inside corporate information to benefit themselves;

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(c)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(e)     remain informed as to how CIBER conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f)     ensure that CIBER was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

110.   Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to CIBER and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of CIBER, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of CIBER, the absence of good faith on their part, and a reckless disregard for their duties to CIBER and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to CIBER.

111.   The Individual Defendants each breached their duty of loyalty and good faith by allowing Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements, or by failing to take any actions to correct the false and/or misleading statements.   The false and misleading statements misled shareholders into believing that CIBER's organizational and management "transformation" was operating successfully and would not have an adverse effect on the Company's financial condition, including its revenues, gross margins, or profitability,

and that the Company was improving reporting and accountability at a managerial level. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action that alleges violations of the federal securities laws.  As a result, CIBER has expended, and will continue to expend, significant sums of money to rectify the Defendants' wrongdoing.

### CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

112.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing.  The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

113.   During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that CIBER's organizational and management "transformation" was operating successfully and would not have an adverse effect on the Company's financial condition, including its revenues, gross margins, or profitability, and that the Company was improving reporting and accountability at a managerial level.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

114.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment and waste of corporate assets; and (b) disguise and misrepresent the Company's future business prospects.

115.   The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements.  Because the actions described

herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

116.   Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.   In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO CIBER

117.   As a result of the Individual Defendants' wrongful conduct, CIBER disseminated false and misleading statements.   The improper statements have devastated CIBER's credibility.   Additionally, CIBER was the subject of a related Class Action lawsuit which required the Company to expend precious Company resources defending itself and certain of the Individual Defendants, and to pay a $3 million settlement to resolve the Class Action.

118.   As a direct and proximate result of the Individual Defendants' actions as alleged above, CIBER's market capitalization has been substantially damaged.

119.   Further, as a direct and proximate result of the Individual Defendants' conduct, CIBER has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)   costs incurred in investigating and defending CIBER and certain officers in the Class Action, as well as cost incurred in paying a $3 million settlement;

(b)   costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on CIBER's artificially-inflated stock price and inflated revenues; and

(c)    costs incurred from the loss of the Company's customers' confidence in CIBER's services.

120.   Moreover, these actions have irreparably damaged CIBER's corporate image and goodwill.  For at least the foreseeable future, CIBER will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that CIBER's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

121.   Plaintiff brings this action derivatively in the right and for the benefit of CIBER to redress injuries suffered, and to be suffered, by CIBER as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  CIBER is named as a nominal defendant solely in a derivative capacity.

122.   Plaintiff will adequately and fairly represent the interests of CIBER in enforcing and prosecuting its rights.

123.   Plaintiff was a shareholder of CIBER common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

124.   Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

125.   At the time this Second Amended Complaint was filed, the Board of CIBER consisted of the following nine individuals: Defendants Peterschmidt, Jacobs, McGill, Kurtz, Spira, and Lauk, and non-defendants Bobby Stevenson, Jean-Francois Heitz, and Michael Boustridge.

### Demand is Futile as to Defendant Peterschmidt

126.    Defendant Peterschmidt cannot render an independent decision because he is and was a high-ranking officer of CIBER during the time period when the wrongdoing occurred.  Defendant Peterschmidt has served as the CEO and a director of CIBER's Board since July 2010, and oversaw the entire Company-wide transition during the Relevant Period.  According to relevant portions of the Company's 2011 proxy statement, Defendant Peterschmidt is not an independent director.  Thus, Defendant Peterschmidt is a current Company insider and therefore cannot independently consider a demand.

127.    Additionally, Defendant Peterschmidt is interested because he knowingly issued many of the false and misleading statements.  Defendant Peterschmidt therefore faces a substantial likelihood of liability for breaching his fiduciary duties to CIBER shareholders.  Consequently, Defendant Peterschmidt cannot disinterestedly consider a demand.

### Demand is Futile as to Defendant Jacobs

128.    Defendant Jacobs faces a substantial likelihood of liability for his individual misconduct.  Defendant Jacobs was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true.  Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Jacobs faces a substantial likelihood of liability.  For this reason demand is futile.

129.   Additionally, Defendant Jacobs cannot render an independent decision because he specifically failed in his obligation to provide truthful information about the Company's transition.   Defendant Jacobs has served as a director of the Company since 2005, and has served as its Chairman since April 11, 2010, before the commencement of the Relevant Period.   In fact, according to the Company, Defendant Jacobs himself was responsible for "guid[ing] the Board through the management transition."   Therefore, by the Company's own admission, Defendant Jacobs was charged with ensuring that the Company-wide transformation was proceeding smoothly from a Board-level perspective.   This responsibility gave Defendant Jacobs access to and knowledge of the inner workings of the Company's transition, and as a result, gave him actual knowledge of the significant problems facing the Company during the Relevant Period.   However, rather than use this knowledge to authorize the filing of truthful and honest statements about the Company's transition, Defendant Jacobs authorized and/or failed to correct the many false and misleading statements published during the Relevant Period that caused the Company's stock to trade at artificially inflated prices.   For this additional reason demand is futile.

130.   Defendant Jacobs also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee.   As an Audit Committee member, Defendant Jacobs was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections.   However, he utterly failed and/or refused to do so during the Relevant Period when Defendant Peterschmidt and others made wholly unsupportable financial

projections that caused the Company's stock to trade at artificially inflated prices.  For this additional reason demand is futile.

### Demand is Futile as to Defendant McGill

131.   Defendant McGill faces a substantial likelihood of liability for his individual misconduct.  Defendant McGill was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant McGill faces a substantial likelihood of liability.  For this reason demand is futile.

132.   Defendant McGill also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee.  As an Audit Committee member, Defendant McGill was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections.  However, he utterly failed and/or refused to do so during the Relevant Period when Defendant Peterschmidt and others made wholly unsupportable financial projections that caused the Company's stock to trade at artificially inflated prices.  For this additional reason demand is futile.

133.   Defendant McGill also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Compensation Committee.  As member of the Compensation Committee, Defendant McGill approved

excessive and unwarranted compensation and bonus awards in breach of his fiduciary duties.  For this additional reason demand is futile.

### Demand is Futile as to Defendant Kurtz

134.   Defendant Kurtz faces a substantial likelihood of liability for his individual misconduct.  Defendant Kurtz was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Kurtz faces a substantial likelihood of liability.  For this reason demand is futile.

135.   Defendant Kurtz also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee.  As an Audit Committee member, Defendant Kurtz was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections. However, he utterly failed and/or refused to do so during the Relevant Period when Defendant Peterschmidt and others made wholly unsupportable financial projections that caused the Company's stock to trade at artificially inflated prices.   For this additional reason demand is futile.

136.   Defendant Kurtz also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Compensation Committee.  As member of the Compensation Committee, Defendant Kurtz approved excessive and

unwarranted compensation and bonus awards in breach of his fiduciary duties.  For this additional reason demand is futile.

### Demand is Futile as to Defendant Spira

137.    Defendant Spira faces a substantial likelihood of liability for his individual misconduct.  Defendant Spira was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Spira faces a substantial likelihood of liability.  For this reason demand is futile.

138.    Defendant Spira also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Compensation Committee.  As member of the Compensation Committee, Defendant Spira approved excessive and unwarranted compensation and bonus awards in breach of his fiduciary duties.  For this additional reason demand is futile.

### *Demand is Futile as to Defendant Lauk*

139.    Defendant Lauk faces a substantial likelihood of liability for his individual misconduct.  Defendant Lauk was a director throughout the Relevant Period, and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements on behalf of the Company were true. Instead, he reviewed and authorized the publication of materially false and misleading

statements throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.  This authorization of such statements and/or failure to correct them constitutes a breach of fiduciary duty, for which Defendant Lauk faces a substantial likelihood of liability.  For this reason demand is futile.

140.   Defendant Lauk also faces a substantial likelihood of liability for breaching his fiduciary duties as a member of the Company's Audit Committee.  As an Audit Committee member, Defendant Lauk was required to review the Company's financial statements and press releases for accuracy and to make any needed corrections.  However, he utterly failed and/or refused to do so during the Relevant Period when Defendant Peterschmidt and others made wholly unsupportable financial projections that caused the Company's stock to trade at artificially inflated prices.   For this additional reason demand is futile.

141. Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting CIBER by prosecuting this action.  Therefore, demand on CIBER and its Board is futile and is excused.

142.   CIBER has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Against the Individual Defendants for Breach of Fiduciary Duty

143.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.    The Individual Defendants owed and owe CIBER fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed and owe CIBER the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

145.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

146.    The Individual Defendants each knowingly, recklessly or negligently (i) made false or misleading statements that misrepresented or failed to disclose material information concerning the Company, (ii) approved the issuance of such false and/or misleading statements, and/or (iii) failed to take actions to correct such false and/or misleading statements after they had been disseminated by the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

147.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, CIBER has sustained significant damages.  As a result of the misconduct alleged herein, these Individual Defendants are liable to the Company.

148.    Plaintiff, on behalf of CIBER, has no adequate remedy at law.

## COUNT II

### Against the Individual Defendants for Unjust Enrichment

149.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

150.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CIBER.

151.    The Individual Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to CIBER.

152.    Plaintiff, as a shareholder and representative of CIBER, seeks restitution from these Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by these Individual Defendants from their wrongful conduct and fiduciary breaches.

153.    Plaintiff, on behalf of CIBER, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Corporate Waste

154.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

155.    The wrongful conduct alleged regarding the issuance of false and misleading statements, was continuous, connected, and was on-going throughout the applicable time period.  It resulted in continuous, connected, and on-going harm to the Company.

156.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) by paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (ii) providing benefits including

golf club memberships to certain directors; (iii) awarding self-interested stock options to certain officers and directors; (iii) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

157.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

158.    Plaintiff, on behalf of CIBER, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, aiding and abetting breaches of fiduciary duty, and unjust enrichment;

B.      Directing CIBER to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect CIBER and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

- a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

- a provision to permit the shareholders of CIBER to nominate at least two candidates for election to the Board;

- a proposal to ensure the accuracy of the qualifications of CIBER's directors, executives and other employees;

- a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal controls and auditing matters; and

- a provision to appropriately test and then strengthen the internal audit and control functions;

C.    Awarding to CIBER restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: February 26, 2014                    JOHNSON & WEAVER, LLP

                                            *s/ Frank J. Johnson*
                                            Frank J. Johnson

                                            110 West "A" Street, Suite 750
                                            San Diego, CA 92101
                                            Telephone: (619) 230-0063
                                            Facsimile: (619) 255-1856
                                            E-mail: frankj@johnsonandweaver.com


                                            LAW OFFICES OF EVAN S. LIPSTEIN PC
                                            EVAN LIPSTEIN
                                            12600 W. Colfax Ave., Ste. C-400
                                            Lakewood, CO 80215
                                            Telephone: (303) 232-5151
                                            Facsimile: (303) 232-5161
                                            Email: evan@lipsteinlaw.com

                                            *Attorneys for Plaintiff John Seni*